IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 29, 2006 Session

## CITY OF MEMPHIS v. THE CIVIL SERVICE COMMISSION, ET AL.

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-06-0225-03     D.J. Alissandratos, Chancellor**

_____

**No. W2006-01561-COA-R3-CV - Filed March 13, 2007**

_____

This administrative appeal arises out of the termination of Officer Lenora Armstead's (Officer Armstead) employment with the Memphis Police Department (the Department). The City took this action as a result of a public altercation between Officer Armstead and another off-duty police officer. It found that Officer Armstead had violated DR-104 Personal Conduct and terminated her employment because of this violation and other disciplinary proceedings previously brought against her. The Civil Service Commission of the City of Memphis (the Commission) reversed the City's decision to terminate her employment because it found the action to be unreasonable. The City appealed to Shelby County Chancery Court, where the chancellor reversed the Commission's decision, finding it to be arbitrary and capricious. We find that the City proved a violation of DR-104 but that the Commission's decision was supported by substantial and material evidence. We reverse and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and HOLLY M. KIRBY, J., joined.

Thomas E. Hanson and Leigh H. Thomas, Memphis, Tennessee, for the appellant, Lenora Armstead.

Sara L. Hall, City Attorney and Elbert Jefferson, Jr., Deputy City Attorney, for the appellee, City of Memphis.

**OPINION**

This appeal arises out of the termination of Officer Lenora Armstead's (Officer Armstead) employment with the City of Memphis Police Department (the Department) following her altercation with Officer Rodney Adair (Officer Adair), with whom she had been romantically involved for several years. At the time of the incident, both officers were off duty. Much of the underlying facts are not in dispute.

On April 18, 2003, Officer Armstead spoke to Officer Adair at his second place of employment and indicated that she needed to talk with him about their relationship. They both left the establishment in their separate cars and, at approximately 11:00 p.m., arrived in front of Officer Adair's home and continued to talk on their cellular telephones.[1] "Emotionally upset," Officer Armstead insisted that he return items she had given him over the years.[2] Officer Adair arrived first, entered his home alone, and put his phone down, refusing to communicate further with Officer Armstead as she continued to scream at him. Officer Adair had already asked her to leave, but Officer Armstead instead pulled into his driveway and approached his front door.

Officer Adair contends that she then began beating on the door, ringing the doorbell, and screaming obscenities. He estimated that this lasted for two or three minutes and suspected that the neighbors could hear because he saw lights coming on in various homes. The Hearing Summary (completed by Deputy Chief Cook), indicated that Officer Armstead, stated that she merely knocked on the door and rang the doorbell, and she testified to knocking on the door only twice.

Seeking assistance in getting Officer Armstead to leave the premises, Officer Adair then called his friend, Officer Kelly, who was on duty and likely patrolling in the vicinity. Officer Armstead returned to her car and remained there until Officer Kelly arrived. When Officer Kelly arrived, he spoke with Officer Adair, who requested that he move the patrol car to unblock the driveway and allow Officer Armstead to leave the premises. Officer Adair approached her vehicle and again requested that she leave. Officer Kelly, some distance from the car, heard shouting and cursing and then approached the car at Officer Adair's request. They again asked Officer Armstead to leave, but she refused, saying she'd broken no laws. After being asked again, Officer Armstead exited her car and was obviously angry. Officer Kelly placed her back in her car and demanded that she leave. Officer Armstead continued to yell and curse at Officer Adair from the car and then exited the car yet again. Officer Kelly then stood between them.

The parties dispute what transpired next. Officer Adair's original Aggravated Assault Victim/Witness statement and Officer Kelly's report reflect that Officer Armstead hit Officer Adair in the face with her closed fist. Officer Adair also submitted a photo of his upper lip, which indeed appeared cut and/or bruised. Officer Kelly's report specified that she hit him with her right fist. At trial, Officer Adair stated that he could not remember whether she hit him or not, but that Officer Kelly would know better. Officer Adair did state that "she came out mad and reaching" and that Officer Kelly then stood between them. Officer Armstead, on the other hand, testified that she did not strike him with her fist. She admitted to the yelling and cursing, the exiting from her car, and Officer Kelly's standing between them, but she denied attempting to assault anyone.

---

[1]The parties dispute whether Officer Armstead followed Officer Adair to his home. Admitting that Officer Armstead lived in the same vicinity as he did, Officer Adair testified that each time he would make a turn, she was behind him. Officer Armstead, on the other hand, stated that she merely followed a route that lead to her home and decided to turn on Officer Adair's street because they were talking on their cellular telephones at the time.

[2]Officer Adair stated that she screamed, "I want all of my shit back that I have given you over the years."

At this time, Officer Adair requested a supervisor.  Officer Kelly physically placed her back in her car, and she started the ignition and began to back up.  She then opened the car door and struck Officer Adair with it.  In an effort to "get away from her," Officer Adair began to walk down the driveway toward the patrol car.  Continuing to back out of the driveway, Officer Armstead hit Officer Adair with the back of her car, causing Officer Adair to roll off the trunk and fall to the ground.  Officer Adair reported falling to the pavement and sustaining injuries to his right elbow, right hip, and face (causing his lip to bleed).  Officer Armstead contended he was not in view before impact, fell to the grass (not the pavement), seemed to be uninjured and "faking" it, and never sought medical attention.  She further asserted that upon first seeing him on the ground, she believed he had fallen on his own.  Officer Armstead submitted photographs of the seemingly unblemished trunk of her car.  She did not stop to render assistance but did pull back into the driveway and say Officer Adair was "just faking."  Officer Adair testified that he could not say whether Officer Armstead knew she had hit him with the car or not.  She then left the premises, and Officer Kelly called a supervisor.

At the direction of his supervisor, Officer Adair gave a statement that evening at the Felony Response Office, which resulted in aggravated assault domestic violence charges being brought against Officer Armstead.  The statement reflected the foregoing facts as well as an allegation that Officer Armstead had committed aggravated assault that evening.

Officers Armstead and Adair communicated by telephone a couple of days later, and Officer Armstead apologized for her behavior.  The next day, Officer Adair amended his original statement and clarified that he could not be sure that Officer Armstead intended to hit him with her car, given the lighting conditions, time of night, and dark clothing he wore.  Although Officer Adair did not explicitly recant his allegation of aggravated assault, he impliedly did so by stating that he had alleged this fact, but that his allegation "was based on information that [he] was receiving from the incident" and indicated that he no longer wanted to prosecute her.  He concluded by noting that "at the time . . . there was anger by both parties which made the incident appear to be more than it really was."  At the hearing before the Commission, Officer Adair denied having given a false original statement and explained that he amended it because his head was clearer and he realized he had been quite angry when giving his first statement.

As a result of Officer Adair's original statement, an arrest warrant was issued for Officer Armstead, who surrendered herself and pled not guilty.[3]  The Memphis Police Department[4] charged Officer Armstead with the violation of Memphis Police Department Rule-104 Personal Conduct (DR-104 Personal Conduct), which provides as follows:

---

[3]Officer Armstead was later found not guilty for aggravated assault.

[4]The Department also charged Officer Kelly for failing to comply with rules and regulations and Officer Adair for failing to call a supervisor.

The conduct of each member, both on and off duty, is expected to be such that it will not reflect adversely on other members, the Department, the City of Memphis, or the law enforcement profession. This regulation applies to both the professional and private conduct of all members. It prohibits any and all conduct which is contrary to the letter and spirit of the departmental policy and procedure which reflect adversely upon the Department or its members. It includes not only all unlawful acts by members but also acts which, although not unlawful in themselves, would violate the Law Enforcement Code of Ethics, and would degrade or bring disrespect upon the member of the Department.

On May 27, 2003, Deputy Chief C.S. Cook (Chief Cook) conducted an administrative hearing and ultimately terminated Officer Armstead's employment. She appealed to the Civil Service Commission of the City of Memphis (the Commission or the Civil Service Commission), which heard the appeal in June 2005 and rendered its decision on December 16, 2005. The Commission unanimously restored Officer Armstead's position with back pay and benefits. The City then filed a writ of certiorari and supersedeas in Shelby County Chancery Court and presented its case on June 19, 2006. The chancellor reversed the Commission's ruling, finding it arbitrary and capricious. In the court's opinion, the City had carried its burden of proof, and the Commission had erred in light of the undisputed facts of the case, which showed "an exercise of poor judgment, lack of self control." The chancellor noted that law enforcement officers are expected to have, at minimum, self control. And, in the chancellor's opinion, the undisputed facts showed that Officer Armstead was careless and reckless to continue to pursue Officer Adair in the circumstances and was responsible for the escalation of the matter. For these reasons, the chancellor found the Commission's action arbitrary and capricious and accordingly reversed its decision.

We disagree. Upon a thorough review of the record, we find that the City carried its burden in proving a violation of DR-104 Personal Conduct, but we cannot say that the Civil Service Commission's decision regarding the reasonableness of the termination was error.

### The Issues Presented and the Standard of Review

We restate the issue presented by the parties on appeal as whether the trial court erred when it reversed the Civil Service Commission's ruling and affirmed the City's decision to terminate the employment of Officer Lenora Armstead. Officer Armstead asserts that substantial and material evidence supports the decision of the Civil Service Commission. The City of Memphis, on the other hand, contends that the trial court's reversal was proper because, at the Commission hearing, the City proved by a preponderance of the evidence that its decision to terminate Officer Armstead was reasonable.

*Applicable Standard for the Trial and Appellate Courts*

On appeal, Officer Armstead argues that the Civil Service Commission's decision to reverse the City's termination of her employment was supported by substantial and material evidence.[5] This is an appeal from the trial court's judgment rendered pursuant to the statutory writ of certiorari as provided in title 27, chapter 9 of the Tennessee Code. *See* Tenn. Code Ann. §§ 27-9-101 to -114 (2000 & Supp. 2006). This statutory writ is available following a proceeding conducted before a civil service board that affects a civil servant's employment status. *See* § 27-9-114; *Tidwell v. City of Memphis,* 193 S.W.3d 555, 559 (Tenn. 2006). The application of these provisions requires compliance with the standards of the Uniform Administrative Procedures Act (UAPA), including the judicial standards of review set forth in Tennessee Code Section 4-5-322. Tenn. Code Ann. § 27-9-114(b)(1). Under the UAPA, administrative agency decisions are subject to review in chancery court, without a jury, and limited to the administrative record. Tenn. Code Ann. § 4-5-322(g) (2005) (providing, however, that review of procedural errors is not limited to the administrative record). Subsection (h) specifies the scope of judicial review as follows:

> (h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5) (A) Unsupported by evidence which is both substantial and material in light of the entire record.
> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h) (2005).

Upon confirming that an agency has employed the proper legal principles in the case under review, this Court must then consider the disputed factual findings and address whether the agency had a reasonably sound basis for making those findings. *See McEwen v. Tennessee Dep't of Safety*,

---

[5] In the lower court, Officer Armstead contended that, in her case, the standard of review on appeal required reversal only if the Commission's decision was unsupported by *any* material evidence in the record. This is the standard of review under the common law writ of certiorari, which no longer applies to judicial review of cases within the scope of Tennessee Code Annotated Section 27-9-114. *See Tidwell*, 193 S.W.3d at 559 (noting that a 1989 amendment to this chapter supplanted the more limited scope of the common law writ of certiorari with the broader standards of the Uniform Administrative Procedures Act (UAPA)).

173 S.W.3d 815, 820 (Tenn. Ct. App. 2005). Like the trial court, this Court applies the substantial and material evidence standard in reviewing the agency's findings of fact. *Bobbitt v. Shell,* 115 S.W.3d 506, 509–10 (Tenn. Ct. App. 2003). Substantial and material evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Dickson v. City of Memphis Civil Serv. Comm'n*, 194 S.W.3d 457, 464 (Tenn. Ct. App. 2005); *Pruitt v. City of Memphis,* No. W2004-01771-COA-R3-CV, 2005 WL 2043542, at *7 (Tenn. Ct. App. Aug. 24, 2005) (*no perm. app. filed*); *Bobbitt*, 115 S.W.3d at 510.

As directed by the statute, we take into account whatever in the record fairly detracts from the weight of the evidence, but we may not substitute our own judgment on questions of fact by re-weighing the evidence. *See* Tenn. Code Ann. § 4-5-322(h)(5)(B). When the agency conducts a hearing and can evaluate the witnesses as they testify, this Court gives the tribunal's credibility determinations great weight. *Pruitt*, 2005 WL 2043542, at *7. Moreover, the substantial and material evidence standard does not justify reversal of an administrative decision only because the evidence could also support another result. *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001). Rather, we may reject an administrative determination only if a reasonable person would necessarily arrive at a different conclusion based on the evidence. *Id.*

*The Standard of Review for the Civil Service Commission*

Section 246 of the Charter of the City of Memphis provides that "[t]he City may terminate, suspend, or demote an employee for just cause, and the employee shall be given a written notice of the reasons for the action taken." Charter of City of Memphis §246 (renumbered as section 7 under article 34 by ordinance number 3233, adopted Aug. 31, 1982). Moreover, when an employee appeals to the Civil Service Commission for a review of disciplinary action, section 248 provides that "[t]he burden of proof required to sustain the action of the City shall be by a preponderance of the evidence. If, after a presentation of the proof, the commission finds that there exists a reasonable basis for the disciplinary action taken, the action of the City shall be sustained." Charter of City of Memphis §248 (renumbered as section 9 under article 34 by ordinance number 3233, adopted Aug. 31, 1982). The Civil Service Commission was required to determine whether the City had shown, by a preponderance of the evidence, a reasonable basis for its decision to terminate the employment of Officer Armstead.

*Analysis*

*The Questions Before this Court*

In order to prevail in the proceeding before the Civil Service Commission, the City must have shown by a preponderance of the evidence that Officer Armstead violated DR-104 and that the

violation, in addition to surrounding circumstances, furnished a reasonable basis to terminate her employment. In accordance with Tennessee Code Annotated Section 4-5-322(h)(5), we must consider whether the record contains substantial and material evidence to support the Civil Service Commission's determination that the City failed to prove the reasonableness of its decision.

We begin by reviewing the City's reasoning for the action taken. Following the administrative hearing, Chief Cook issued a statement setting forth his findings of fact and the basis for the action taken. He noted that

> it is determined that by her actions on the scene, . . . by refusing to leave upon being asked, by creating a disturbance by screaming and cursing, by striking an off duty officer with her fist and by backing over him with her automobile, subsequently resulting in her arrest, a published news article with negative publicity and an aggravated assault warrant being sworn against her, she is in violation of DR-104, Personal Conduct.

> Upon review of Sgt. Armstead's disciplinary record which indicates a pattern of incidents that involve controlling her anger, (listed), it is the determination of this hearing officer that Sgt. Armstead is to be terminated from employment with the Memphis Police Department.

In sum, the City based its decision to terminate Officer Armstead's employment on the events at issue, which constituted a violation of DR-104, and on her disciplinary record, which suggested anger management problems.

We next consider the Commission's reasons for reversing the City's action. In a decision issued on December 16, 2005, the Civil Service Commission concluded that the City's decision to terminate Officer Armstead was not reasonable based on its analysis of the events of that evening, Chief Cook's reliance on an incomplete investigative report and her personnel record, Officer Adair's repudiation of his original statement, and Officer Armstead's job performance and character as shown at the hearing.

We first consider the Commission's findings regarding the events of April 18, 2003. The Commission found that the altercation occurred but apparently did not find that Officer Armstead struck Officer Adair with her closed fist. The decision is silent regarding this allegation. We have reviewed the record thoroughly and find it to support either conclusion. Both Officers Adair and

Kelly[6] reported it with specificity in their reports, but Officer Armstead denied the allegation during her testimony, and Officer Adair gave an equivocal response when asked about it on the stand. Because this finding depends upon a credibility determination and the record presents no compelling evidence to the contrary, we decline to reverse the Commission's finding.

The Commission justifies its decision in part by stating that Officer Armstead complied with Officer Kelly's instruction to leave the premises. Our review of the record reveals that Officer Armstead complied only after the fifth or sixth request that she leave the premises.

The Commission also cited as support Officer Adair's reluctance to testify against Officer Armstead as well as his preference to drop the charges altogether. Perhaps most telling of Officer Adair's "change of heart" was his testimony regarding his amendment to the original statement given to the Felony Response Unit. On the one hand, in that Officer Adair's amendment stated the events looked worse than they were, we find his changed view of matters to be irrelevant to the issue of whether the City had reason to terminate Officer Armstead. If we assume the altercation appeared as the facts suggest, Officer Adair's view of the event's significance does not bear upon the damage done to the reputation of Officer Armstead, of the Memphis Police Department, or of the profession in general. On the other hand, in that the amendment reflects Officer Adair's reconsideration of Officer Armstead's intent (or lack thereof) with respect to hitting him with her vehicle, his repudiation of these allegations does bear upon the issue of whether the event was an accident as alleged by Officer Armstead. Once again, this determination depends upon credibility assessments, and we find no evidence to compel us to reverse the inference of accident made by the Commission.[7]

We believe the record supports the Commission's treatment of the altercation itself. Yet, its decision fails to distinguish between the violation of DR-104 and the decision to terminate employment. Even assuming that Officer Armstead did not strike Officer Adair in the face and that she hit him with her car accidentally, we find that the City carried its burden on the issue of violation of the rule. The record abundantly supports the conclusion that Officer Armstead's conduct diminished her reputation as well as that of the Department and the law enforcement profession.

A violation of DR-104 may or may not justify the termination of employment. In rendering its decision, the Commission considered other factors outside the altercation itself to determine whether her termination was reasonable. First, it took notice of Officer Armstead's law enforcement awards, reputation within the community as well as the police force, and her officer performance reports for the years 2000 through 2002. By all accounts, Officer Armstead displayed a strong work

---

[6]Officer Kelly attempted to amend his report when he appeared before Chief Cook but was denied the opportunity to do so. The record does not reveal what in the report Officer Kelly intended to change.

[7]Although the decision does not explicitly cast the event as an accident, we believe this conclusion is obvious given the decision's tone and result.

ethic and was an excellent employee who took initiative in her job and readily volunteered for community projects. The 2001 employment report indicated that Officer Armstead had a verbal confrontation with another officer in October of that year but that she had received counseling on compatibility issues. Even with this lower mark, Officer Armstead received "very good" scores, as considered by Chief Cook, for all three years. Although the City contends that the reports do not detail her conduct since the end of 2002, we note that most of the prior disciplinary actions relied upon by the City occurred prior to 2002.

An important point noted by the Commission involved a prior incident that led Chief Cook to conclude Officer Armstead had a propensity for violence and trouble controlling her anger. The City terminated Officer Armstead's employment in 1998 for a DR-104 violation stemming from allegations that she assaulted her daughter and handcuffed her to the bed. Later, however, the charges were dropped, and Officer Armstead was reinstated with full back pay. Officer Armstead testified that her daughter was an unruly sixteen year old who had endangered the safety of her younger sibling. She told her daughter she was going to take her to Juvenile Court, and her daughter began to fight her physically, kick her, and curse her. Officer Armstead, smaller in stature than her daughter, then handcuffed her in an attempt to subdue her and protect herself. She summed up the issue thus: "my unruly daughter . . . was, also, pregnant at the time and fighting me and everything else. All I did was try to get help and restrain her. Since that time, I have not been charged with anything . . . ."

Officer Armstead's minister of thirty-eight years, Reverend Melvin Charles Smith (Reverend Smith), testified on her behalf and confirmed that her daughter was very unruly and that she also physically struck her daughter in addition to handcuffing her. Reverend Smith also testified that her daughter was jailed for cursing out the Juvenile Court judge, but that she had since grown into a responsible and productive lady. Although he disagreed with the handcuffing, he believed she needed significant parental intervention and found nothing wrong with Officer Armstead's physical discipline of her. Our reading of the Commission's view of this incident is that it was a special circumstance and should not be viewed as an example of a violent propensity. No evidence in the record compels us to disagree with the Commission's conclusion.

In reviewing the Commission's decision, we also must consider evidence that fairly detracts from it. The record still presents the undisputed facts of the altercation and Officer Armstead's violation of DR-104. Further, even though her conduct may not have been as intentional as it seemed, the effect of its appearance to the public remains, and the damage to reputation still detracts from the evidence supporting the Commission's decision. Moreover, Reverend Smith testified that Officer Armstead had problems with her temper in the past, but that she had gone to anger management counseling and put it behind her. And, Officer Armstead's personnel file contained no less than nine violation charges between 1994 and 1998. Five of the nine violation charges were dismissed or otherwise revoked, but only one of the four violations was explained by Officer Armstead. On April 27, 1997, Officer Armstead was suspended one day for a DR-104 violation and

given a written reprimand. She testified that she "had words" with another female officer, who then bumped her with her squad car. It appears from the record that Officer Armstead is no stranger to controversy or conflict, but the other three unexplained violations occurred between 1994 and 1996. This span of time between the violations and the event in question, in our view, lessens the impact of those early disciplinary actions.

In light of these facts that tend to detract from the evidence supporting the Commission's decision, we must determine whether there still exists substantial and material evidence to support its finding that the City had not shown a reasonable termination. After due consideration, we believe a reasonable mind could either accept the evidence as support for the Commission's conclusion or reject it. In applying the proper standard of review, we cannot reverse an agency determination simply because the evidence also supports another conclusion. On the one hand, Officer Armstead conducted herself inappropriately on April 18, 2003, and her personnel record reveals a history of discipline issues. On the other hand, her conduct was not so egregious in itself as to dictate termination; her job performance has been otherwise exemplary; the primary DR-104 violation cited by the City revealed a mother trying to manage an unruly teenager larger than she was; and the other violations in her record occurred several years before the event in question, separated by excellent job performance reports and multiple commendations. We view this evidence as support for either result, but we cannot conclude that the evidence would cause a reasonable person necessarily to decide that the City had proven the reasonableness of her termination.

Accordingly, we hold that the chancellor erred in finding the Commission's decision to be arbitrary and capricious. For the foregoing reasons, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion. The costs of this appeal are taxed to the City of Memphis, for which execution shall issue if necessary.

_____
DAVID R. FARMER, JUDGE