IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 18, 2015 Session


**CBS OUTDOOR, INC. v. TENNESSEE DEPARTMENT OF
TRANSPORTATION**


**Appeal from the Chancery Court for Davidson County
No. 13238I     Claudia Bonnyman, Chancellor**

_____


**No. M2014-01677-COA-R3-CV – Filed November 6, 2015**
_____


Owner of back-to-back billboards filed a petition for review challenging the decision of
the Tennessee Department of Transportation ("TDOT") to revoke his billboard permits
on the ground that the billboards were not in compliance with the TDOT spacing
requirements.  We find substantial and material evidence to support the decision of the
TDOT Commissioner and, therefore, affirm the chancellor's decision.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**


ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS,
and W. NEAL MCBRAYER, JJ., joined.

Garrett E. Asher and Jennifer C. Surber, Nashville, Tennessee, for the appellant, CBS
Outdoor, Inc.

Herbert H. Slatery, III, Attorney General and Reporter, and Bruce M. Butler, Senior
Counsel, for the appellee, Tennessee Department of Transportation.


**OPINION**


FACTUAL AND PROCEDURAL BACKGROUND


In September 2005, William Thomas filed applications with the Tennessee
Department of Transportation ("TDOT" or "the Department") for billboard permits for
both sides of a proposed billboard (a back-to-back billboard) on property he owned on
Jackson Avenue in Memphis.  On his applications, Mr. Thomas acknowledged

preexisting signs to the east and west and stated that those signs were more than 1000 feet from the proposed site. A TDOT field inspector performed a pre-construction inspection to verify the accuracy of the information in the permit applications. The permit applications were approved, and the permits were issued on October 18, 2005. A TDOT inspector also did a post-construction inspection to ensure that the billboard was built according to the permits. The inspector determined that the billboard had been built where it had been permitted to be built.

In July 2006, CBS Outdoor ("CBS") bought the Jackson Avenue back-to-back billboard from Mr. Thomas for $145,200.00. Prior to making this purchase, CBS confirmed that the billboard was properly permitted by TDOT. CBS also relied upon a previous survey conducted by Mr. Thomas.

In February 2010, Clear Channel, the owner of the billboard to the west of the billboard owned by CBS, notified TDOT that the Jackson Avenue sign was actually less than 1000 feet from Clear Channel's billboard. It submitted a survey showing that CBS's billboard was 968 feet from Clear Channel's billboard. TDOT did an investigation and ordered its own survey, which showed that the CBS billboard was 966.5 feet from the Clear Channel billboard. The Department gave CBS notice of revocation of its permits. CBS stipulated that the Jackson Avenue billboard is located less than 1000 feet from the Clear Channel billboard, which received its permit before the Jackson Avenue billboard.

CBS requested a contested case hearing before an administrative law judge ("ALJ"). Both parties filed motions for summary judgment. CBS relied, in part, upon the depositions of Connie Gilliam, Chester Reid, and Robert Shelby, and the affidavit of David Hogue. The Department relied, in part, upon the affidavit of Mr. Shelby, and the depositions of Ms. Gilliam, Mr. Shelby, and Mr. Reid. We will, therefore, briefly summarize these documents.

Ms. Gilliam was the TDOT employee in charge of regulating and permitting billboards in the state. She was the person who decided to approve the two original applications for permits for Mr. Thomas's back-to-back billboards. Mr. Reid performed the field inspection; he reported that there were at least 1000 feet between Mr. Thomas's billboard location and the existing billboards on either side.

Mr. Reid was a retired TDOT field inspector from the Memphis office. He described how he walked with the measuring wheel to measure between signs. He would measure from the stake to the closest sign. Mr. Reid also discussed the post-construction inspection to "make sure the sign is at the location where the stake was." The inspector took pictures of the stake at the original inspection and, then, at the post-construction inspection verified from the pictures that the sign was where it should be. If there was

any question, the inspector might measure again with the measuring wheel to verify the location and the proper spacing.

Mr. Reid had no independent memory of doing the inspection report for Mr. Thomas's original billboard permits. Asked about the accuracy of the wheel, Mr. Reid stated that, if he were going to measure something for himself, he would not use the wheel. He would use a tape measure or an electronic device. Mr. Reid stated that he did not trust the wheel because "it may roll a little bit further each time it bounces than what it's supposed to, so to get a true, accurate measurement, I'd say a survey crew actually needs to do it." Because of the curves in the road, a tape measure or laser instrument would not work for the field inspection, and it was not practical for TDOT to have a survey for every application.

Mr. Reid described how he used the wheel to measure the distance between the signs:

> Q. When you use the wheel to do the measurements, how do you know exactly—well, where do you measure? And let me ask: I've heard the 90 rule talked about. Is that how you would do the measurements?
> A. Yes. I would get out here on the side of the road facing the sign and try to get equal distance on the sign post or on the—well, at this time, we wouldn't have nothing but a stake, so I'd try to get equal distance on that stake, set my wheel to zero and then start walking it whichever direction I need to measure.
> Q. And it would be based only on your eyeballing where that stake is?
> A. Right?
> Q. And you would eyeball it as close to a 90-degree angle as you could get?
> A. 90 degree. Uh-huh (affirmative response).
> . . .
> Q. . . . And then where would you then walk with the wheel?
> A. Try to walk—of course, we had to walk in a safe area or try to get in a safe area, but we would try to walk and run the wheel right at the edge of the pavement of the highway and walk that distance to the next existing sign or to the—or until we get 1,000 feet. Now, if there's no sign erected beyond this sign (indicating), then all we need to do is measure 1,000 feet and it would be legal, but then you'd have to measure from the post sign back to the sign that's already erected.
> . . .
> Q. Did you ever measure, when you were doing this job, along the white strip of the interstate, or is it that you measured on the end of the pavement

of the shoulder?

A.  End of the pavement.  Yeah.  Yeah, that would—if you measure on that white strip, it will lengthen your distance a little bit.

Robert Shelby was a regional TDOT manager for beautification based in Jackson, the office that oversaw billboard permits for the Memphis area.  He reported to Ms. Gilliam.  The applications for new billboard locations came to him, and he distributed them to inspectors.  When the final permits were issued, he recorded them in inventory and assigned an inspector to do a final inspection.  He described the permitting and inspection process.

Mr. Shelby was asked a hypothetical question as to what TDOT would have done if it had received a complaint that the spacing between the CBS billboard and the Clear Channel board was only 968.6 feet based upon a wheel measurement rather than a survey.  He opined that TDOT probably would not act upon such a complaint without more evidence to go on in light of the lack of accuracy of a wheel measurement:

A. This particular location is in a curve.  To get an accurate reading, based on how measurements are supposed to be taken, with simply a wheel, if it's that close, it's probably not going to be accurate with a wheel.
Q.  And that's something that TDOT was aware of even in 2005?
A.  Yes.
Q.  Why is it, then, your inspectors, in 2005, used only wheels to measure the distance between billboards?
A.  Because the application—the applicant certified on the application that there was 1,000 feet between the signs.
Q.  And do you ask how the applicant in the application came up with the measurements?
A.  How he came up with those measurements?
Q.  Yes, sir.
A.  No.

Mr. Shelby also gave the following testimony concerning the purpose of TDOT's inspection:

A.  [Y]ou'll have to remember that that measurement taken by the inspector is not a survey.  The 90-degree that's called for in the rules and regs is—it's an estimate.  You can't be sure, and then when it's this close, you're relying on the information given in the application.
Q.  Which doesn't contain any specifications of how you have to measure, correct?

4

A.  No.  It just says if any information is found to be false, the permit will be voided.

If anyone called wanting to know if a particular billboard in West Tennessee was properly permitted, Mr. Shelby would likely be the one to take their call.  He testified that, if the billboard was properly permitted, his response would be, "Our records show it to be legal."

In his affidavit, Mr. Shelby testified, in part, as follows:

3.  I have known and worked with David Hogue [real estate manager for CBS] with respect to his outdoor advertising business activities since approximately 1985 when he worked for Naegele Outdoor Advertising in Memphis.

4.  I have no recollection that David Hogue called or wrote to me in 2005 or 2006 asking to verify the status of permits 79-3075 and 79-3076, or any other permits.  I have searched and found no notes indicating that any such call was ever made or letter ever written to me by David Hogue.  I do not believe that any such call or inquiry was ever made.

. . .

6.  The Department inspects proposed billboard sign locations for purposes of issuing permits once only.  This inspection includes measuring spacing from a proposed location and the location and area is photographed.  Once a permit is issued the Department revisits the location to make sure that the proposed sign is actually built within 180 days as required by the applicable Rules and Regulations. . . .

CBS submitted the affidavit of David Hogue, its real estate manager and the person who verified that the billboards purchased by CBS from Mr. Thomas had valid permits.  Mr. Hogue testified, in pertinent part:

10.  Prior to purchasing the Jackson Avenue Exit sign, I verified that the sign was properly permitted.  Through my investigation, I learned that the Tennessee Department of Transportation issued permits for the sign in October of 2005.  Having knowledge of the permitting process, I knew that for a new sign to be permitted by the Tennessee Department of Transportation, an independent investigation of the proposed site for the structure would be performed by an investigator from the Tennessee Department of Transportation.  I knew that the investigation would include a measurement of the spacing of the sign before the sign would be allowed to be constructed.  I also knew that an inspection of the sign would be

5

performed after it was constructed to ensure that the sign was built according to the initial application for the permit. I knew that if there had been any problems with the spacing, the permit would not have been granted.

. . .

13. . . . The Tennessee Department of Transportation did not provide any information that would indicate that the sign was not legal. Any person who researched the legality of the sign would reasonably come to the conclusion, based on the steps that TDOT is required to take before allowing a billboard to be built and maintained, that the Jackson Avenue Exit sign was legal.

14. I, and through me, CBS Outdoor, Inc., relied on the representations of the Tennessee Department of Transportation that the billboard was legal. I, and through me, CBS Outdoor, Inc., relied on the representation of the Tennessee Department of Transportation that the spacing between the Jackson Avenue Exit sign was 1000 ft. or greater.

. . .

25. It is the standard in the billboard industry to rely on representations of the government bodies that there exist valid legal permits on billboards such as the Jackson Avenue Exit sign when deciding whether to purchase a billboard. When CBS Outdoor, Inc. relied on representations of the Tennessee Department of Transportation through its permitting process that the sign was legal, CBS Outdoor, Inc. complied with the standards in the industry. CBS Outdoor, Inc., based on standards in the industry, was not required to do anything else to determine whether the sign was legal prior to purchasing it. It would not be reasonable to investigate the legality of every billboard to be purchased when valid permits exist. . . . Based on my experience in this business, the employees of the Tennessee Department of Transportation are aware that billboard companies such as CBS Outdoor, Inc. rely on the existence of permits in deciding whether to purchase billboards.

## Agency decision

The ALJ granted TDOT's motion for summary judgment and denied CBS's motion for summary judgment. The ALJ concluded that the Department had shown by a preponderance of the evidence that the Jackson Avenue billboard was in violation of the applicable spacing laws, and that the Department properly voided CBS's permits. Furthermore, the ALJ determined that CBS failed to show that it was entitled to equitable relief.

The ALJ's findings of fact include the following:

3.  Thomas' signature appears on the application just below the following language:

I hereby certify that I have personally examined and understand the "Rules and Regulations for the Control for Outdoor Advertising" and this application is made in compliance with same, and further certify that the statements made on the application are accurate and true to the best of my knowledge and understand that *if investigation reveals that any of the information on the application is false the permit will be voided, tag confiscated, and the Outdoor Advertising Devices will be declared illegal.* Emphasis added.

. . .

6.  CBS did not independently verify the spacing of the Jackson Avenue billboard.  CBS instead relied upon the Department's issuance of a permit for the sign in determining it to be legally constructed.

The ALJ's analysis includes the following statements: "It is not disputed the Jackson Avenue billboard violates spacing requirements.  Nor is it disputed Thomas negligently or intentionally misrepresented the spacing between the Jackson Avenue billboard and the sign immediately to its west."

CBS filed a petition for reconsideration, which was denied by the ALJ.  CBS then appealed to the Commissioner, who entered a final order on January 3, 2013 adopting the ALJ's findings and affirming his decision.

## Petition for review

CBS filed a petition for judicial review in chancery court on February 25, 2013 alleging that it was entitled to relief from the Commissioner's final order.  Both sides filed briefs, and oral argument was held on May 28, 2014.  On July 15, 2014, court was reconvened, and the chancellor announced her ruling containing her findings of fact and conclusions of law from the bench.  On August 13, 2014, the court entered an order affirming the Commissioner's final order.

## Issues on appeal

On appeal, CBS asserts that the trial court erred:  (1) in finding that the Commissioner's decision was supported by substantial and material evidence in light of the entire record; (2) in finding that the doctrine of equitable estoppel did not apply to prevent TDOT from revoking the billboard permits; and (3) in finding that the doctrine of

unclean hands did not apply to prevent TDOT from revoking the billboard permits.

STANDARD OF REVIEW

The applicable standard of review is found at Tenn. Code Ann. § 4-5-322(h):

The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Under the Uniform Administrative Procedure Act ("UAPA"), this court, like the trial court, must apply the substantial and material evidence standard to the agency's factual findings. *City of Memphis v. Civil Serv. Comm'n*, 239 S.W.3d 202, 207 (Tenn. Ct. App. 2007); *Bobbitt v. Shell*, 115 S.W.3d 506, 509-10 (Tenn. Ct. App. 2003). Substantial and material evidence is "'such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.'" *Macon v. Shelby Cnty. Gov't Civil Serv. Merit Bd.*, 309 S.W.3d 504, 508 (Tenn. Ct. App. 2009) (quoting *Pruitt v. City of Memphis*, No. W2004-01771-COA-R3-CV, 2005 WL 2043542, at *7 (Tenn. Ct. App. Aug. 24, 2005)). It is "'something less than a preponderance of the evidence, but more than a scintilla or glimmer.'" *Id.* (quoting *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988)). We may overturn the administrative agency's factual findings "only if a reasonable person would necessarily reach a different conclusion based on the evidence." *Davis v. Shelby Cnty. Sheriff's Dep't*, 278 S.W.3d 256, 265 (Tenn. 2009) (citing *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001)). This narrow standard of review for an administrative body's factual determinations "suggests that, unlike other civil appeals, the courts should be less confident that their judgment is preferable to that of the agency." *Wayne Cnty.*, 756

8

S.W.2d at 279.

With respect to questions of law, our review is de novo with no presumption of correctness. *Cnty. of Shelby v. Tompkins*, 241 S.W.3d 500, 505 (Tenn. Ct. App. 2007). Issues of statutory construction present questions of law and are therefore reviewed de novo with no presumption of correctness. *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009).

ANALYSIS

Substantial and material evidence

CBS argues that the trial court erred in finding that the Commissioner's decision was supported by substantial and material evidence.

Congress enacted the Federal Highway Beautification Act of 1965 to control the erection and maintenance of billboards along interstate and primary highways, to "protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty." 23 U.S.C.A. § 131(a). This act requires states to provide for "effective control of the erection and maintenance" of billboards. 23 U.S.C.A. § 131(b). In compliance with the federal act, Tennessee enacted the Billboard Regulation and Control Act of 1972, codified at Tenn. Code Ann. §§ 54-21-101 through -123, which confers full authority upon the TDOT Commissioner to enforce the provisions of both the federal and state acts. *See* Tenn. Code Ann. §§ 54-21-112 and -116.

The Department has responsibility for enforcement of the provisions of the Billboard Regulation and Control Act. *See* Tenn. Code Ann. §§ 54-21-112, 54-21-116. Department rules provide that, with respect to outdoor advertising on interstate highway systems and controlled access primary highways, "[n]o two structures shall be spaced less than 1000 feet apart on the same side of the highway." TENN. COMP. R. & REGS. 1680-02-03-.03(1)(a)(4)(i)(I). In the present case, there is no dispute that the Jackson Avenue billboard was less than 1000 feet from the Clear Channel billboard. Thus, there was a violation of the TDOT regulations.

The main thrust of CBS's argument is that substantial and material evidence does not support the ALJ's conclusion, adopted by the Commissioner, that the permits could be revoked based upon the negligent or intentional misrepresentation of Mr. Thomas, the builder of the billboard. Section 1680-02-03-.03(1)(a)(9) of the Tennessee Comprehensive Rules and Regulations provides:

9

> (i) The Commissioner has the authority to void an outdoor advertising permit under the following conditions:
>
> > (I) Any negligent or intentional misrepresentation of material fact on any application submitted pursuant to these Rules;
> >
> > (II) Any violation of one or more of the requirements for a permit under Federal or State law or these Rules.

Thus, the regulations contemplate that the Commissioner can void an advertising permit for any violation of the requirements for a permit under state or federal law or the agency rules and regulations.

In light of the fact that there is substantial and material evidence to support the trial court's decision based upon subsection (II) of Tenn. Comp. R. & Reg. 1680-02-03-.03(1)(a)(9)(i), we need not determine whether there was also substantial and material evidence to support a decision pursuant to subsection (I), concerning a negligent or intentional misrepresentation on the application. We note, however, that Mr. Thomas's ability to conduct a survey prior to purchasing the property would suggest that he was negligent in representing on his application that the billboard site met the spacing requirements.[1]

### Estoppel

CBS also asserts that the trial court erred in failing to find that equitable estoppel prevented TDOT from revoking CBS's billboard permits. CBS argues that, when it purchased the Jackson Avenue billboards, it relied upon TDOT's determination that spacing requirements were met as a result of the Department's issuance of permits to Mr. Thomas.

In Tennessee, the rule is that "the doctrine of estoppel generally does not apply to the acts of public officials or public agencies." *Bledsoe Cnty. v. McReynolds*, 703 S.W.2d 123, 124 (Tenn. 1985). Only under "very exceptional circumstances" does equitable estoppel apply against the state and its subdivisions. *Id.* The elements a party must show to invoke the doctrine of equitable estoppel are the following:

> (1) his or her lack of knowledge and of the means of knowledge of the truth as to the facts in question;

---

[1] Moreover, as noted above, the ALJ found that there was no dispute that Mr. Thomas "negligently or intentionally misrepresented the spacing between the Jackson Avenue billboard and the sign immediately to its west."

10

(2) his or her reliance upon the conduct of the party who is estopped; and

(3) action by the invoking party based thereon of such a character as to change that party's position prejudicially.

*Sexton v. Sevier Cnty.*, 948 S.W.2d 747, 751 (Tenn. Ct. App. 1997). In those cases where estoppel has been applied against a public body, "the public body took affirmative action that clearly induced a private party to act to his or her detriment, as distinguished from silence, non-action or acquiescence." *Bledsoe*, 703 S.W.2d at 125; *see also Carpenter v. State*, 838 S.W.2d 525, 528 (Tenn. 1992).

In order "[f]or estoppel to arise, the act must have been done with the knowledge that it would be relied upon and the other party has acted in reliance without either knowledge of the true state of affairs or the means of learning the true state of affairs." *City of Lebanon v. Baird*, 756 S.W.2d 236, 244 (Tenn. 1988). Thus, "'[w]here both parties have the same means of ascertaining the truth, there can be no estoppel.'" *Id.* (quoting *Early Co. v. Williams*, 186 S.W. 102, 105 (Tenn. 1916)).

On the issue of equitable estoppel, the chancellor reached the following conclusions in her oral ruling:

> And here the Court applies the principles of law as the appellate Court has explained and finds that CBS had the opportunity, and actually a strong motivation, to discover the billboard spacing illegality before its purchase of the billboard, and for some reason CBS did not independently verify the spacing of the billboard that it was purchasing from Mr. Thomas. As the Supreme Court stated [in *City of Lebanon v. Baird*, 756 S.W.2d at 236], where parties have equal opportunity to discern a particular problem or a particular fact, then estoppel would not apply, and this Court would think that that would be especially true for applying the estoppel doctrine to government. Now, whether it's government or not, CBS had an equal opportunity to discover the billboard spacing illegality as equal as available as [sic]—as did Mr. Reid for TDOT.
>
> Did CBS change its position and reliance on TDOT's issuance of permits and then suffer unjust financial hardship? This issue or this subissue is another reason why the estoppel doctrine cannot apply to the facts in this case and the grant of summary judgment to TDOT was proper and lawful. CBS did not suffer unjust financial hardship. This is not to say that it doesn't matter that CBS buys a billboard and then finds out later that the spacing is not as it should be. . . . However, CBS did not suffer unjust financial enrichment [sic] because, fortunately, even though this mistake was made by TDOT, even though CBS spent $145,000 in its purchase of

11

the billboard, CBS has generated $20,000 in net income per year since 2006. And I know and understand that CBS would like to continue to do that, and I have sympathy with that. But CBS has been able, if not completely bring itself even and—and repay itself its purchase price—and I'm not even addressing all the good facts, options, and opportunities that are available to CBS in terms of depreciations and that sort of thing.

The real—the real price is probably not $145,000, but be that as it may, it was an expensive billboard, and billboards are expensive. But CBS was able to generate enough funds that this Court cannot find . . . that there has been the kind of unjust financial damage to CBS as there was in the *Needham*[2] case in which Needham had actually either rebuilt—either built a building for its beer marketing—for its beer market or it has remodeled an older building. . . . [T]here was no proof in the *Needham* case that—that Needham had been able to generate enough money to pay itself back and make its loss—and mitigate its losses.

As stated above, a central requirement of the doctrine of equitable estoppel is the plaintiff's lack of knowledge and lack of a "'convenient and available means of acquiring such knowledge.'" *Far Tower Sites, LLC v. Knox Cnty.*, 126 S.W.3d 52, 67 (Tenn. Ct. App. 2003) (quoting *Haymon v. City of Chattanooga*, 513 S.W.2d 185, 189 (Tenn. Ct. App. 1973)). CBS had the means to conduct a survey to confirm the billboard's compliance with the spacing requirements; it chose instead to rely upon TDOT's permitting process. Moreover, CBS signed a statement on the permit application stating that it was familiar with the rules and regulations and was aware that any noncompliance would result in revocation of the permit.

The primary Tennessee case[3] relied upon by CBS is *Needham v. Beer Board of*

---

[2] *Needham v. Beer Bd. of Blount Cnty.*, 647 S.W.2d 226 (Tenn. 1983), a case relied upon by CBS, will be discussed below.

[3] CBS also relies upon the Illinois appellate court case of *Drury Displays, Inc. v. Brown*, 715 N.E.2d 1230 (Ill. Ct. App. 1999), a case in which a property owner sought a writ of mandamus to compel the reissuance of billboard permits and an injunction prohibiting the removal of the billboard. *Drury*, 715 N.E.2d at 1233. The Court of Appeals found no abuse of discretion in the trial court's issuance of a writ of mandamus on the theory that the officials were equitably estopped from revoking the property owner's permits. *Id.* at 1234-35. We find this case distinguishable from the present case by the "substantial loss" the court found that the billboard permittee would suffer if estoppel were not applied. *Id.* at 1235. Furthermore, we do not find the reasoning of this opinion persuasive.

The Department cites *Eller Media Co. v. City of Los Angeles*, No. B159378, 2003 WL 21744316 (Cal. Ct. App. 2 Dist. July 29, 2003), a case that reached the opposite conclusion from *Drury*. In *Eller*, Eller constructed a billboard after receiving a permit, and the Department later revoked the permit on the ground that it was issued in error because Eller's billboard violated the spacing requirements by being too close to a previously permitted billboard. *Eller*, 2003 WL 21744316, at *1. The previous permit, for

*Blount County*, 647 S.W.2d 226 (Tenn. 1983). The petitioners in *Needham*, the Henrys, filed a petition for writ of certiorari seeking a declaration that the county's rule prohibiting the sale of beer within 2000 feet of schools, churches, and other places of public gathering was invalid due to the beer board's actions in issuing permits to previous applicants whose premises were less than 2000 feet from a church or school. *Needham*, 647 S.W.2d at 227. When the petitioners received their permits, the beer board measured the distance between a site and a church or school by driving in a car between the two places and relying on the car's odometer to determine the distance. *Id.* at 228. By the time the petitioners' permits were revoked, the board had changed its rules to require a straight line method of measuring distances. *Id.* at 229-30. Using this new method, the petitioners' properties were less than 2000 feet from the closest church or school. *Id.* at 230.

The *Needham* court determined that the petitioners, who had expended significant amounts of money in reliance on the permits, "relied on the license to their detriment and . . . that the revocation of their licenses would create a significant hardship and would be unjust." *Id.* at 231. As the court noted in *Far Tower*, the Supreme Court in *Needham* did not base its decision on estoppel. *Far Tower*, 126 S.W.3d at 68. Rather, the court held that the petitioners "established a sufficient hardship and detrimental reliance to warrant an exception to the Blount County 2,000 foot rule." *Needham*, 647 S.W.2d at 231.

*Needham* is distinguishable from the case at bar. The method used to measure the distance from the permitted property to the church or school in *Needham* changed between the time of the original permit and the revocation. *Id.* at 230. When they received their original permits, the petitioners did all they could to confirm that their property complied with the spacing requirements using the measuring methodology in use at that time. *Id.* at 229. Two of the petitioners in *Needham* established that they would suffer significant hardship if their permits were revoked. *Id.* at 231. They spent large amounts of money constructing or remodeling buildings and would not have done so without the issuance of the beer permit. *Id.* In the present case, the chancellor found that CBS had recouped the money it had put into buying the billboard. Moreover, there was no change in the rules of measurement as in *Needham*.

---

which the billboard had not yet been constructed at the time of the issuance of Eller's permit, was not discovered by the Department until after Eller constructed its billboard. *Id.* The California court stated: "Although the injustice to Eller is substantial, the law does not support estopping [the] Department to enforce the billboard ordinance." *Id.* at *9. The Court found *Drury* unpersuasive. *Id.* Weighing the effect on public policy of applying estoppel against the injustice to Eller, the court concluded that the public policy must prevail. *Id.* The court stated that this was "not the 'extraordinary case' in which to apply estoppel against the government." *Id.* (quoting *Smith v. Cnty. of Santa Barbara*, 7 Cal.App.4th 770, 775 (1992)).

CBS spends a large portion of its brief arguing that TDOT should be estopped from enforcing its regulations because of the conduct of one of its employees, Mr. Reid. CBS argues:

> The trial court, however, disregarded and omitted from its analysis and ruling Mr. Reid's substantial and material testimony that inspectors will, at times, when they perform a post-construction inspection, misstate the measurement numbers on purpose. Mr. Reid testified that, as an inspector, he had the discretion to deem a sign legal, even when the sign did not meet spacing requirements. Mr. Reid felt that it would be too expensive and cause a hardship on a billboard company if the company would have to move a sign if he reported the sign to be less than 1000 feet away from another one post-construction. Therefore, if he measured a sign to be less than 1000 feet, he would write down that it was 1000 feet or greater to avoid legal problems for the company that constructed the sign.

Mr. Reid's specific testimony was that he would consider a sign to be 1000 feet if it was within a "reasonable tolerance of the correct measurements."

There is no evidence that Mr. Reid or any inspector exercised this type of discretion in the present case. In fact, the evidence shows that the post-construction inspection typically consisted of taking pictures to establish that the billboard was built in the proper place. Unless there was a question as to the location of the billboard, measurements would not be taken.

As stated by the court in *Bledsoe*, estoppel should be applied against public agencies only in very exceptional circumstances. *Bledsoe*, 703 S.W.2d at 124. In this case, CBS had equal access to the means of finding out whether the billboard met the spacing requirements before it purchased the billboard. We find no error in the trial court's decision not to apply the doctrine of estoppel.

Unclean hands

CBS asserts as its final argument that the trial court erred in failing to apply the doctrine of unclean hands to prevent TDOT from revoking CBS's permits. Specifically, CBS argues that TDOT, through its employee Mr. Reid, has unclean hands: "Whether Mr. Reid simply mismeasured the distance between the Jackson Avenue Billboard and the billboards to the east and west of it, or intentionally indicated on the inspection report that the spacing requirement was met when his investigation revealed otherwise . . . , his actions were inequitable and illegal." According to CBS, it would therefore be "unjust for TDOT to be allowed to undo its wrongdoings . . . at the expense of innocent parties . .

14

. who have relied to their detriment on official TDOT actions and decisions."

Addressing this argument, the trial court stated:

> There was no proof in the record, and no fact in dispute presented by any party, to show that Mr. Reid had treated this particular transaction in a way that would be unfair to CBS or in a way that would be intentionally inaccurate or in a way that would cause Mr. Reid to do less work. And so in this particular transaction there is no indication, there's no dispute in fact, about Mr. Reid's conduct. There's no implication, there's no fact presented, to show that Mr. Reid somehow was involved in misconduct in his measuring or reporting the situation for Mr. Thomas' plans to erect the billboard where he did ultimately erect it. And so this Court finds that the unclean hands doctrine, equitable doctrine, applied as the appellate courts have directed the trial courts to apply, is not available to CBS as a way to attack the voiding of its billboard permit.

We find no error in the trial court's analysis and conclusion. The doctrine of unclean hands "provides the court with a basis to decline to grant relief to parties who have willfully engaged in unconscionable, inequitable, immoral, or illegal acts with regard to the subject matter of their claims." *In re Estate of Boote*, 265 S.W.3d 402, 417 (Tenn. Ct. App. 2007) (footnote omitted). There is no evidence of conduct by Mr. Reid rising to the level required to invoke the doctrine of unclean hands. Moreover, as discussed above, CBS could have verified the distance between the billboards before purchasing the Jackson Avenue billboard.

CONCLUSION

We affirm the decision of the trial court in all respects. Costs of appeal are assessed against the appellant, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

15