# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 4, 2016 Session

## THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY v. THE CIVIL SERVICE COMMISSION OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, ET AL.

### Appeal from the Chancery Court for Davidson County
No. 14-187-III      Ellen Hobbs Lyle, Chancellor

_____

### No. M2015-01488-COA-R3-CV – Filed June 30, 2016

_____

An officer with the Davidson County Sheriff's Department was terminated for dishonesty and related charges after he filed official reports alleging that he had been attacked by another officer and lost consciousness during training exercises. The Department investigated the officer's claims and found that they were exaggerated and that his dealings with claims representatives and other personnel were hostile and dishonest. After a disciplinary hearing, the Department decided to terminate the officer. An administrative law judge ("ALJ") determined that the officer should be reinstated with only a ten-day suspension. The Civil Service Commission adopted the ALJ's initial order as its final order with a few changes. The Metropolitan Government of Nashville and Davidson County ("Metro") filed a petition for review in chancery court, and the court held that the decision of the Civil Service Commission that the officer had not committed the conduct at issue was not supported by substantial and material evidence. The chancery court reversed the decision of the Commission as to the officer committing the misconduct and remanded to the Commission for a determination of the appropriate disciplinary sanction. We affirm the decision of the chancery court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON, II, J., joined.

Jerry Clark, pro se, Dunlap, Tennessee, appellant.

J. Brooks Fox, Lora Barkenbus Fox, and Catherine J. Pham, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

Jerry Clark, the pro se appellant, is a former employee of the Davidson County Sheriff's Office ("DCSO") who was terminated for dishonesty, conduct unbecoming a Metro employee, and related grounds. These charges arose out of training exercises on October 4, 2012 after which Mr. Clark filed official reports alleging that he had been attacked by another officer, David Peralta, and rendered unconscious during the training.

An investigator for the DCSO, Devan Franklin, conducted an investigation and prepared a report based upon interviews with Mr. Clark, Mr. Peralta, and eight other witnesses. Investigator Franklin concluded, in pertinent part:

> The allegation of Assault on Staff is unfounded. Based on witness statements, indications are that the incident that took place did not happen as Clark described. Clark described being knocked unconscious by Peralta from some sort of strike; however the only strike that the witnesses described is the kick from Clark that struck Peralta in the face. Clark claimed that he was rendered unconscious by Peralta a second time from a leg-assisted choke; however, witness statements are consistent that Clark never lost consciousness. In fact, witnesses described events that would require Clark's full awareness and consciousness. It appears that Clark never showed any sign of injury until he spoke to Johnson [the instructor] at the [shooting] range about being in pain. The timing of the "fuzzy" feeling Clark described appeared to be a matter of convenience in that it only impacted him before and after the firearms portion of the training, but not during when he participated in and scored well on the qualification. Also, any ill effects from the incident were apparently not enough to prevent Clark from participating in the remainder of subject control training. Witnesses said that Clark continued with the remainder of training, participating in takedowns and asking clear questions throughout its duration. Clark claimed to have received information about events that happened while he was unconscious from Tracy, but Tracy's statements concerning the incident are inconsistent with Clark's statements. Clark's own statements were inconsistent at times; at one point, he stated that Peralta specifically picked him as his partner for the purposes of attacking him, but later said that it was possible they were partners because "It just kind of fell that way."
>
> On the message board for the fantasy football league, Clark described being "dragged by the neck" but did not describe himself as being dragged during the interview. It should be noted that the time-stamps on the fantasy

- 2 -

football message board occurred approximately 30 minutes before his visit to Middle Tennessee Medical Center. This calls into question his assertion that he went to the hospital because his pain level was overwhelming. Also, Clark commented on the fantasy football message board "He [Peralta] may have a job now {but} I am seriously seeking charges," suggesting that he planned to file a police report with the intent to impact Peralta's employment with the DCSO.

Witness statements suggest that Clark was performing exercises at a level of resistance that was more than required. . . . Peralta admitted that he did "flip" Clark at one point, but he did so in an act of defense rather than an attack. Not a single witness, including those not interviewed, described the incident as an outright attack by Peralta on Clark; generally it was viewed as a training exercise that got out of hand. Clark's account of the incident is not corroborated in any way by the witnesses, and it appeared to be overly exaggerated, and at some points, completely falsified. Feggins went so far as to say that Clark is "lying through his teeth."
. . .
Emails written by Clark to Easley [claims adjustor] seem to be suggestive of an attempt to receive time off work and be compensated while out. . . . These actions suggest that Clark may have been attempting to take advantage of the benefits of the Metro IOD [Injury on Duty] program.

In a December 13, 2012 charge letter, Byron Grizzle, DCSO's Director of Human Resources, informed Mr. Clark that he was alleged to have violated a list of DSCO policies and civil service rules:

DAVIDSON COUNTY SHERIFF'S OFFICE POLICIES
1-1.312 EMPLOYEE CONDUCT POLICY
Grounds for Disciplinary Action
4.      Failure to establish and maintain effective working relationships;
10.     Failure to comply with reasonable standards of conduct in a manner that reflects poorly upon the employee, the DCSO, or the Metropolitan Government, and/or violates the public trust;
25.     Abuse of leave, excessive absenteeism or tardiness;
26.     Knowingly making false statements, deliberately omitting facts, or failing to cooperate during an inquiry or investigation, whether formal or informal;
27.     Dishonest behavior;
32.     Degrading, harassing, or cursing any person
1-1.309 Attendance, Benefits and Leave
Sick Leave:  Abuse of Sick Leave

- 3 -

Employees who abuse sick leave, or deliberately cause others to make false or misleading statements or claims, shall be subject to disciplinary action.

CIVIL SERVICE RULES
SECTION 6.7 GROUNDS FOR DISCIPLINARY ACTION
11.    Violation of any written rules, policies or procedures of the department in which the employee is employed;
13.    Dishonesty;
33.    Conduct unbecoming an employee of the Metropolitan Government.

The letter informed Mr. Clark that an informal disciplinary meeting was to be held on December 17, 2012 to allow him or his representative to present his account of the incident, review the DCSO's information, and introduce information and witnesses of his own.

After this meeting, which was postponed until December 18, 2012 at Mr. Clark's request, he received a letter from panel member Corley Pearson notifying him that the hearing panel had voted to terminate his employment. According to Mr. Pearson, Mr. Clark "acknowledged no responsibility in any part of the incident" and his "claim of receiving a concussion is not backed up by a qualified neurologist." Mr. Clark was found by the panel to have violated all of the DCSO policies and civil service rules identified in the December 13 letter with the exception of abuse of leave, excessive absenteeism or tardiness; and abuse of sick leave. Based upon its review of the witness statements, the panel found that Mr. Clark had omitted facts and that he had not been rendered unconscious. The panel found "by a preponderance of the evidence that [Mr. Clark's] version of events is not accurate."

Hearing before ALJ

Mr. Clark elected to appeal the decision of the DCSO disciplinary panel to the Civil Service Commission of the Metropolitan Government of Nashville and Davidson County ("the Commission"). An administrative law judge ("ALJ") held a hearing on April 29, 2013 at which the DCSO and Mr. Clark were represented by counsel.

The DCSO introduced the affidavit of Vincent Feggins, who was unavailable to attend the hearing and who testified by affidavit that he was present at the October 4, 2012 training and witnessed from "only a few feet away" the incident involving Mr. Clark and Mr. Peralta. Mr. Feggins noticed that Mr. Clark was "going harder than instructed" and Mr. Peralta told him to "ease up." Instructor Kevin Johnson told Mr. Clark and Mr. Peralta, "Stop, that's enough." Mr. Clark and Mr. Peralta were wrestling. According to Mr. Feggins, "Mr. Peralta had his back against the wall and was holding Jerry Clark in a front neck control." Mr. Feggins saw Mr. Clark kick Mr. Peralta in the face; then Mr. Clark took Mr. Peralta to the floor and the instructor went over and

separated them. The instructor sent Mr. Peralta downstairs and Mr. Clark to the other side of the classroom. Mr. Feggins "saw and heard Mr. Clark participate and ask questions throughout the rest of the training class." He "did not see Jerry Clark 'get dragged by the neck,' as Jerry Clark claimed on a message board for a fantasy football league." Mr. Feggins did not see what Mr. Clark described as a "scissor-lock" maneuver. Furthermore, Mr. Feggins testified, he did not see Mr. Peralta "apply pressure to Jerry Clark's neck when he was in the front neck control position . . . ." He also did not see Mr. Clark "lose consciousness or get knocked out" and he "did not think Jerry Clark seemed fuzzy or dazed after the incident."

Mr. Feggins further stated that he stood by the following statement given in an interview with Investigator Franklin on October 17, 2012:

> Me and Peralta ain't the best of friends either, but I don't want to see no man lose his job over a bunch of lies. And the guy [Mr. Clark] is lying through his teeth. He never passed out, he never lost consciousness. He got up, just like anybody else and walked over here (pointing in the direction Clark would have walked at Johnson's instruction[)]. And what he's doing is wrong.

Metro's first live witness was Mr. Johnson, the training instructor. He explained that he always gave a pre-safety briefing at the beginning of each class that included instructions on how to stop an exercise for any reason. Mr. Johnson testified that Mr. Clark was "very familiar" with the training classes. At the time of the incident, the students were doing a drill on "defensive entry," and Mr. Johnson instructed them to apply only twenty to thirty percent effort. Mr. Johnson commanded the students to engage. It was Mr. Clark's turn to "enter," so Mr. Peralta's back would be against the mat/wall. Scanning across the room, he noticed that Mr. Clark and Mr. Peralta "had taken it to the ground," which was not uncommon. Mr. Johnson was in the middle of the room and felt the attention of the group being drawn to something over his shoulder. He looked and saw that Mr. Peralta had Mr. Clark "in a front head control." The two were standing. Mr. Johnson told Peralta to let go; he did not let go at first. Mr. Johnson raised his voice and approached; Mr. Peralta let go. Mr. Peralta's face was red and he looked "upset, hurt, angry, something, excited." Mr. Peralta told Mr. Johnson that he had been kicked, so Johnson sent him to the bathroom to clean himself up. Mr. Johnson told Mr. Clark to find a different partner. When Mr. Johnson went to the bathroom to check on Mr. Peralta, he noticed that Mr. Peralta had a bloody nose. Upon returning to the mat room, he found that Mr. Clark had found new partners and "was fully engaged with the exercise."

When asked how long he thought the entire incident took, Mr. Johnson stated: "Seconds, fifteen seconds, maybe less than—we're talking command of go, engaged, I turned, walked to the center of the floor, looked back I'm saying fifteen seconds

perhaps." Mr. Johnson did not notice that Mr. Clark was unconscious at any point during the training. Asked about his experience with being knocked unconscious, Mr. Johnson testified:

> A. Yeah, I've got 15 years of competition and 35 years of training professional and amateur fighting. I've been knocked out both by knock out and restraint, vascular restraint and I've experienced a lot of people that have been knocked out by blunt force and vascular restraint.
> Q. So it's fair to say you have experience observing others who have been knocked unconscious; is that correct?
> A. That's correct.
> Q. Okay. Can you tell the Court what you observed in Mr. Clark that makes you think he was in a fully conscious state?
> . . .
> A. . . . He was on his feet, his eyes were clear. When I separated them, he never complained about anything like that. He walked on his own power back to engage into the class. If he would have complained, I would have sat him down and put ice on him, consulted him and made sure he didn't continue. But as far as being knocked unconscious, no, ma'am, it takes time to be rendered unconscious and it takes time to recover. And I just didn't see any of that, no.

Mr. Johnson further testified that he did not see Mr. Peralta drag Mr. Clark by his neck. Mr. Peralta had Mr. Clark in a front head lock in a position of "front head control." Mr. Johnson did not notice Mr. Clark "appearing fuzzy or disoriented in any way that day," and Mr. Clark did not complain of such symptoms. For the remainder of the class, Mr. Clark participated fully in all of the exercises without any problems. Mr. Johnson spoke with Mr. Clark at the end of the class and Mr. Clark said that he was fine.

After lunch, the students went to the firing range for firearm training. Before the session began, Mr. Clark approached Mr. Johnson and said that his neck "might be hurting." Mr. Clark said he was well enough to shoot. After a session of shooting, he approached Mr. Johnson again and said his neck was hurting. Mr. Johnson told Mr. Clark that they needed to complete an Injury on Duty report as soon as possible. Mr. Clark continued with the firearm training and scored in the expert range, significantly better than his scores the previous two years.

The next day, Mr. Johnson received an email from Mr. Clark stated that "he felt that he had been assaulted in the class, he had been rendered unconscious and he was looking at filing criminal charges." Mr. Johnson opined that it was "very unlikely" that Mr. Clark had been rendered unconscious twice, as he claimed. Mr. Johnson had not seen it. According to Mr. Johnson, "it takes fifteen to twenty seconds to render someone unconscious, sometimes thirty seconds to a textbook application [of] leg scissors." He

further stated that "it's very, very difficult to render someone unconscious from leg scissors." Moreover, Mr. Johnson opined that it takes "twenty seconds before you recover [from being rendered unconscious] and then it's hours before you're completely recovered." With a concussion, it had taken up to a week for Johnson to be "clear."

Mr. Peralta was the next to testify. He stated that Mr. Clark "was being more forceful than necessary for training" and would make each step difficult "by resisting or using his weight or using force on top of that." Mr. Peralta, therefore, "had to use my own strength to push him back and it would cause the instructor to tell us to stop." Mr. Peralta further testified:

> So the second time we did it [the maneuver] again, I pushed him to the side again and he tried to tackle me, again where he wrapped his arm across my shoulder—his arm across my shoulder and the other one on my leg and trying to take me down. And the instructor was telling him to stop, and he wouldn't stop, so I flipped him off of me and I fell to the ground and he fell to the ground. So I thought it was over because the instructor was still telling us to stop and I was picking myself up and he grabbed my leg and pulled me back down. So when I fell back down, I wrapped his head around with my legs in a headlock, and instructor told us to stop, so I stopped and, you know, I didn't hold him in that headlock for more than a second or two. And as I was pulling myself up, I didn't see it, but he kicked me across the face. And I got mad and jumped up and he tried to tackle me and that's when I got him in a headlock and applied a lot of pressure to make him stop, because I was mad, I wanted to fight, but the instructor was telling us to stop.

Mr. Peralta stopped after the instructor came and tapped him on the shoulder and told him to go downstairs. He had a bloody nose.

According to Mr. Peralta, Mr. Clark was never rendered unconscious and never appeared fuzzy or disoriented. He never saw Mr. Clark lose control of his body or collapse. Mr. Clark never asked Mr. Peralta to stop or to let go of him. Later on, Mr. Clark approached Mr. Peralta and they shook hands. Mr. Peralta observed Mr. Clark through the rest of the day, during the remaining training and the firearms testing, and Mr. Clark did not appear to have any trouble participating in these activities.

Mr. Franklin testified about his investigation of the allegation that Mr. Peralta assaulted Mr. Clark during a training exercise. He interviewed Mr. Clark, Mr. Peralta, and multiple witnesses and reviewed the medical reports. As previously discussed, Mr. Franklin concluded that the complaint was unfounded.

Metro called five more witnesses from the training session on October 12, 2012. Their testimony is, in many ways, similar. Solomon Holley said that, after Mr. Johnson told the students to stop moving, Mr. Clark and Mr. Peralta continued. They began to wrestle, "locked up," and went to the ground. According to Mr. Holley, Mr. Peralta got "Mr. Clark in like a scissors hold, I saw Mr. Clark attempt to position his body to do the same movement against [Mr. Peralta], his foot striking [Mr. Peralta] in the face." Finally, Mr. Johnson walked over, put his hands on them, and told them to "break it up." Mr. Holley did not notice any injuries and did not notice Mr. Clark ever being rendered unconscious or appearing fuzzy or disoriented. He stated that he was close to them and that his "eyes were on him the entire time, on both of them." He did not see Mr. Clark lose control of his body and collapse to the ground or lie on the floor with his eyes closed. Mr. Holley did not hear Mr. Clark complain or ask Mr. Peralta to let go.

After the incident, Mr. Clark rejoined the class and began working with Mr. Holley and Mr. Culpepper. He did not report any injuries or pain. The training continued with exercises involving head and neck control, body control methods, and take downs. Mr. Holley reported that Mr. Clark "took me to the mat." He described himself as "a big guy, I'm 240 pounds and I bench 340." Mr. Clark took him to the mat "several times, no problem."

David Tracey gave a similar description of the altercation between Mr. Clark and Mr. Peralta as did Mr. Holley. He, too, denied that Mr. Clark was ever rendered unconscious. Mr. Tracey also did not see Mr. Clark lose control of his body or collapse, and he did not hear Mr. Clark complain or cry out for Mr. Peralta to let go of him. Mr. Tracey acknowledged that Mr. Clark called him and asked him what happened after the incident and that he told Mr. Clark the same thing as he had just testified. He denied telling Mr. Clark that he was violently attacked or dragged by the neck.

The next witness was Kyle McMaster, another officer who was present during the training. He was paired with Mr. Feggins and generally had his back to Mr. Clark and Mr. Peralta. When the pairs were going through the scenarios a second time, Mr. Feggins commented that Mr. Clark and Mr. Peralta were getting involved again, so Mr. McMaster turned around. Mr. Clark and Mr. Peralta "were on the ground, kind of intertwined, wrestling in some sort of like ruckus." After Mr. Johnson told them to stop for the second or third time, they stopped. Mr. McMaster thought it was all over so he turned back toward his partner, but he heard "more of a ruckus" and looked back to see the following:

> Clark was bent over grabbing [Peralta's] legs and [Peralta] was leaned over, kind of had him around the—like the front arm and neck, trying to hold him there and was being pushed against the wall. And at that point in time, Instructor Johnson is yelling at them to stop, he runs over, separates them, it's done. He tells [Peralta] to go down, cool off, go get a drink and looks

at Clark and asked him if he's okay, gives him a few minutes and we carry on and he changes to another group.

Mr. McMaster did not notice any injuries. He testified that Mr. Clark was not rendered unconscious at any point during the incident and that he did not recall Mr. Clark appearing fuzzy or disoriented. After the incident, Mr. Clark went straight over and began working with another group. Mr. McMaster never saw Mr. Clark lose control of his body or collapse. He never heard Mr. Clark complain or cry out to Mr. Peralta to stop or see him indicate that he wanted to stop the exercise. He saw Mr. Clark continue with the class, engage in the exercises, performing take downs and being taken down.

Jason Hart, another officer who attended the class, stated that he had a clear view of Mr. Clark and Mr. Peralta. He heard some commotion and saw Mr. Clark and Mr. Peralta pushing and shoving one another. Then, he saw Mr. Clark throw or push Mr. Peralta into the wall. The two men "fell to the floor and then Officer Mr. Clark, not intentionally per se, but kicked [Peralta] in the face. And at that time then it got, you know, a little more serious. As far as them going into what we call the red zone, kind of the tunnel vision . . . ." Mr. Hart was not aware of Mr. Clark being rendered unconscious and did not notice him appearing fuzzy or disoriented. He did not see Mr. Clark lose control of his body or collapse or see him lying on the ground with his eyes closed. Mr. Hart also did not hear Mr. Clark complain to Mr. Peralta to let him go or signal to be released. After the incident, Mr. Hart did not observe Mr. Clark have any trouble participating in the remainder of the training.

Franklin Taylor also observed Mr. Clark and Mr. Peralta at the training. When Mr. Johnson told them to disengage, Mr. Clark "lunged forward towards [Peralta] with his foot like he was about to hit him and [Peralta] just hold on to him to stop the blow and it just looked like [Peralta's] head was in between Clark's legs." According to Mr. Taylor, Mr. Clark "was squeezing him until they finally let go." After the incident, Mr. Taylor did not notice any injuries, just Mr. Peralta's red face from being "clamped down." He did not notice Mr. Clark being rendered unconscious or appearing fuzzy or disoriented at any point. He never saw Mr. Clark lose control of his body or collapse. He never heard Mr. Clark complain to Mr. Peralta or indicate that he needed a break. Mr. Taylor testified that Mr. Clark fully participated in the remainder of the training. He described Mr. Clark as being the aggressor in the incident that occurred during the training.

The final witness from the training exercise was Phillip Dover. He saw Mr. Clark and Mr. Peralta on the floor "almost like in a ball, kind of rolling back and forth." They kept rolling around even after Mr. Johnson told them to stop. After the third or fourth time Mr. Johnson said to stop, the two men were on their feet, and Mr. Peralta had Mr. Clark in "like a headlock, you know, in the front. [Peralta] I think was against the wall and Mr. Johnson had to come over there and, you know, tell them one more time." Mr.

Dover did not notice any injuries from the incident, other than Mr. Clark's face being a little red. He testified that Mr. Clark was never rendered unconscious and did not appear fuzzy or disoriented at any point. Mr. Dover did not see Mr. Clark lose control of his body, collapse, or lie on the ground with his eyes closed. He did not ever hear Mr. Clark cry out or complain to Mr. Peralta or physically signal that he wanted to end the exercise. Mr. Dover did not observe anything unusual about Mr. Clark's behavior during the remainder of the day or hear him complain of lightheadedness or injuries.

Metro's next witness was Brandi Easley, a claims adjustor for Alternative Service Concepts, the organization hired by Metro's benefits board to administer its Injury on Duty ("IOD") program, which she described as Metro's version of a workers' compensation program. She detailed her interactions with Mr. Clark. Ms. Easley contacted him to find out what treatment he had received and to assist him with getting the care he needed. She decided to assign Mr. Clark a case manager "because from my very first conversation with him I felt like there were red flags." She further testified:

> [I]t was an explosive conversation, I'm not really sure how else to put that, with lots of exclamations about being drug around by his neck and that he'd already been to the ER twice and—you know, and so—or was it three times? I don't remember. He's already been to the ER several times and I was like, okay, this is—this is a very unusual case so I'm going to go ahead and request case management to get him to a neurologist and get a diagnosis and find out what's going on here.
> . . .
> [H]e was very upset, very, very upset. Every time I talked to him he was very upset and just kind of accusatory of everything and, you know, just very unusual. I don't know how else to put that.

Mr. Clark described his injuries to Ms. Easley: He stated that he had passed out several times, that "he didn't remember some stuff," and that "he had been drug around by his neck."

The case manager made an appointment for Mr. Clark to see neurologist Dr. Graham, who opined that he could return to work. After that appointment, Mr. Clark called Dr. Graham a "quack doctor" and berated Ms. Easley for sending him to Dr. Graham. Ms. Easley informed Mr. Clark that he could see another doctor of his choosing. The second doctor sent Mr. Clark for several tests, the results of which were all normal. Mr. Clark was referred to a "spine doctor," but he elected to see other doctors on his own. He did not want Ms. Easley or the case manager to be involved.

Metro introduced the emails between Ms. Easley and Mr. Clark, and Ms. Easley testified that Mr. Clark would criticize her for taking so long and for failing to do her job when, in fact, she was bypassing procedures to get things done for him as quickly as

possible. In the last communication she had with him, Mr. Clark was "basically accusing [her] of not doing [her] job and hindering his medical care . . . ." Ms. Easley acknowledged that Mr. Clark was not the first person who had gotten upset with her, but she described his behavior as "over the top" and "unprofessional."

Laura Stamos Smith, the case manager assigned to Mr. Clark and a registered nurse, testified that she accompanied Mr. Clark to his appointment with Dr. Graham but did not go into the examination room with him. She called Mr. Clark after the appointment to let him know that Dr. Graham had found no signs of a concussion and that his physical exam was completely normal. Mr. Clark called her back ten or fifteen minutes later and was "irate" and "rude." He told Ms. Smith that she was not doing her job and that she needed to make an appointment for him to see his own doctor. Ms. Smith explained that this was not her role. Mr. Clark began cursing and hung up.

Katie Stone, an attorney for the DCSO, was the last witness for Metro. She served as the chair of the panel at Mr. Clark's disciplinary hearing. She testified that Mr. Clark talked for about an hour and a half at the hearing:

> [A]t first he was calm during the hearing, got a little more agitated as the hearing went on, but he was very adamant the whole time that he had been knocked unconscious. And that seemed to be what—during—he had been knocked unconscious during this training exercise and that was really the main focus of what he was talking about was how he had been knocked unconscious several times. And during the course of him describing what happened, his story seemed to kind of change a little bit even from the beginning of the hearing to the end of the hearing. For example, toward the beginning of the hearing he was talking about being aware of what had happened, of being aware that he had been knocked out or that he was being—he was being held in a [choke] hold. But then later in the hearing he said he didn't know what was going on, he wasn't conscious during any of that time and that it was only later when reading the comments on the football blog, that he knew what had happened at all.

Ms. Stone did not recall Mr. Clark claiming to have any pictures of his injuries. Mr. Clark claimed that Ms. Smith had called his wife "with no prompting at all, which is not true." Mr. Clark's wife called Ms. Smith, and Ms. Smith called her back.

Ms. Stone was asked to explain the panel's findings of guilt regarding the various charges:

> A. Well, basically there was an altercation and he—not only was there an altercation in this instance, throughout the hearing he talked about different issues he had had with officers and how he didn't—he tended not to get

- 11 -

along with other officers. So we felt that that sort of lended itself to him being guilty of failure to establish and maintain effective working relationships.

Q. And is it fair to say that his conduct surrounded with the training incident with [Peralta] did not establish working relationships?

A. Absolutely. Yeah, especially once he got on the football blog saying that he wanted to have—he wanted [Peralta] to be—basically I guess paraphrasing, basically wanted to have [Peralta]] fired, but he wanted his job.

Q. Okay. Now, what about the next one, I believe, that said failure to comply with reasonable standards of conduct that reflect poorly upon the employee . . . and the employer?

A. That went to two different issues, one, our feeling that he had fabricated his symptoms afterwards—or fabricated having been knocked unconscious and filing a report with both the Sheriff's office and the police department. I believe he also during the hearing said that he had contacted the DA's office, the—I think ATF, a couple of other agencies, just really making a huge deal out of something that seemed to us he had fabricated. Along with that, his—the way he treated the ACS worker and the Eckman/Freeman case manager. That was wholly inappropriate and I think we all decided it looked—it reflected very poorly on the Sheriff's office.

Q. Okay. And I think you alluded to this before, but the next two charges, basically both include dishonesty. Can you describe why the board found him guilty of those.

A. Yeah. He was very focused on having been knocked unconscious. I think it's important to remember that he was not facing a disciplinary charge because he and [Peralta] had gotten into an altercation. He was facing disciplinary [charges] because he was saying he had been knocked unconscious. We had statements from I believe eight other people who all said he never—he was never knocked unconscious, no one said he was knocked unconscious. In fact, several had said that he was fully participating. And that was the reason.

Q. Okay. And what about the degrading or harassing or cursing any other person?

A. That was specifically a conversation with Laura Smith, that he was cussing her.

Q. Okay. And I believe that the Civil Service Rules are basically the same, similar violations?

A. Yes.

Asked why the panel decided to terminate Mr. Clark's employment, Ms. Stone explained that the DCSO took dishonesty "very seriously." She testified that, in their line of work, honesty was of paramount importance:

Well, [without honesty], his fellow officers aren't going to trust him, his superiors aren't going to trust him, the people who work under him are not going to trust him. If he is charged with the care of inmates, it's important to be honest when it comes to how you take care of the inmates as well.

With respect to the "conduct unbecoming" charge, Ms. Stone testified that "[c]orrection officers are expected to be professional and courteous and able to work with other people." To do their work, the DCSO officers rely on relationships with other agencies and individuals and have to be able to "work effectively with people."

There were questions regarding Mr. Peralta's past disciplinary charges and the absence of any disciplinary action against him in the present matter. Mr. Peralta was previously disciplined for transporting too many inmates at once and failing to adequately supervise inmates. Ms. Stone explained that none of Mr. Peralta's prior disciplinary infractions involved dishonesty. Ms. Stone distinguished Mr. Peralta's disciplinary history from Mr. Clark's current charges:

A. [Mr. Peralta] has never been charged with dishonesty, never been charged with conduct unbecoming, I don't believe, anything that would set out a fellow officer as a liar and as a violent individual, which is what Mr. Clark did. I mean, he basically set out one of his fellow employees as someone who rendered him unconscious, which did not happen in our opinion.
Q. Is it fair to say that Mr. Clark was trying to get Officer [Peralta] fired?
A. That's what it seemed like.
Q. And is it fair to say that Mr. Clark was trying to criminally prosecute Officer [Peralta]?
A. He did file criminal charges, yes.

Ms. Stone emphasized that Mr. Clark was not disciplined for what happened in the training room, but for his conduct after the fact. He was disciplined for lying about the extent of his injuries. He was not disciplined for filing an injury on duty report. When asked whether Mr. Clark was "disciplined for false statements he may have made on that injury on duty form and after the fact," Ms. Stone answered in the affirmative.

The first and only witness for Mr. Clark was Mr. Grizzle, DSCO's director of human resources. He testified that he provided Mr. Clark with a copy of his personnel record prior to the hearing. Mr. Clark's evaluation for the period from May 2011 to May 2012 showed proficient scores in all categories. In one section, there was a notation stating that "Corporal Clark is liked by most of his peers." That was the extent of Mr. Clark's proof. Mr. Clark did not testify. Both sides were to submit proposed findings of fact and conclusions of law for consideration by the ALJ.

In an initial order entered on August 29, 2013, the ALJ determined that Mr. Clark should be reinstated to his former position with a ten-day suspension. The ALJ's order includes detailed findings of fact and conclusions of law, which include the following:

8. On October 31, 2012, Investigator Franklin submitted his report regarding the incident. In it he reviewed the witness statements that he considered, including Dr. Graham, but he chose not to interview or obtain statements from the other doctors who treated Mr. Clark prior to Dr. Graham. Investigator Franklin ultimately concluded that Mr. Clark's allegation of assault was unfounded. The report then goes on beyond its stated purpose to comment that Mr. Clark's recitation of the events was not consistent with the testimony of other witnesses, that Mr. Clark made several statements about his injuries and his plans to file a police report on his fantasy football message board, that the incident was most likely a training exercise that got out of hand, that medical documents from Middle Tennessee Medical Center and Vanderbilt Medical Center do diagnose Mr. Clark with a concussion, (Exhibit 6) and that Mr. Clark's communications with Ms. Easley suggest that he was trying to take advantage of IOD program benefits.
. . .
11. On December 26, 2012, the DCSO issued its findings from the [disciplinary] meeting. The DCSO found that Mr. Clark believed that his statements were true, but that they believed they were not. The DCSO then found that Mr. Clark had deliberately omitted or lied about facts, that Mr. Clark had made statements about affecting Mr. Peralta's job, that Mr. Clark had been unduly antagonistic to his case managers, and that Mr. Clark had not suffered a concussion or loss of consciousness based on Dr. Graham's findings. For these reasons, the DCSO elected to terminate Mr. Clark's employment with DCSO. The report (Exhibit 12) did not mention that the panel had considered Mr. Clark's filing of a police report when making its decision.
. . .
13. At the [hearing before the ALJ on April 29, 2013], one of the witnesses called was Investigator Franklin, who testified that it had been his recommendation that neither party be punished for the incident during the training exercise.
. . .

### CHARGES OF DCSO

**Violation of DCSO Policy 1-1.312 Employee Conduct, Number 4: Failure to establish and maintain effective working relationships.**

4.    Katie Stone further testified that Mr. Clark's conduct following the incident might have alienated his fellow officers, preventing him from working well with his peers.  Kevin Johnson and several other witnesses testified that fights occurred in the *dojo*[1] frequently, due to emotions running high and officers becoming too involved in the exercises.  None of the officers called as witnesses testified that they would be unable to work with Mr. Clark after the incident.  In fact, Instructor Johnson and other witnesses testified that following the incident, Mr. Clark was matched up with two other officers, and they all completed the training exercises without incident.  The witnesses also testified that Mr. Clark shook Officer Peralta's hand after the incident.  Furthermore, any attempt to equate Mr. Clark's posts on the Yahoo Sports Fantasy Football message board with his ability to establish and maintain effective working relationships is without merit. . . .   Perhaps even more ironic is that the general consensus among the message board participants is that this entire incident was horseplay that got out of hand, and that Mr. Peralta and Mr. Clark were *both* at fault.  If both officers were at fault, then it logically follows that either one of them had the right to file charges and/or seek medical attention, yet Mr. Clark was ultimately terminated for filing a police report, making his termination retaliatory.

. . .

6.    Katie Stone, when discussing the disciplinary panel's reasons for terminating Mr. Clark, testified that Mr. Clark was not terminated because of the incident at the dojo, but because he filed a "false" police report.  Consequently, Metro's proof falls short of establishing that Mr. Clark failed to establish and maintain effective working relationships.

**Violation of DCSO Policy 1-1.312 Employee Conduct, Number 10: Failure to comply with reasonable standards of conduct in a manner that reflects poorly upon the employee, the DCSO, or the Metropolitan Government, and/or violates the public trust.**

7.  Katie Stone testified that Mr. Clark's filing of a police report in response to this incident was a motivating factor in finding him in violation of this policy, and further testified that Mr. Clark's insistence that he was injured during the incident was a deliberate lie.  However, Mr. Clark's medical records from his visit to the emergency room the night after the incident show injuries consistent with Mr. Clark's description of the incident, and Instructor Johnson testified that he did have to ask Officer Peralta twice to

---

[1] Employees of the DCSO refer to their training facility as the dojo.

- 15 -

let Mr. Clark go from the choke hold and that Mr. Clark's eyes were watery and his face was red when released.

8. Katie Stone testified and wrote in the disciplinary panel's findings that the panel thought that Mr. Clark genuinely believed all of his statements regarding his injuries, and yet found that he had intentionally lied about them. A person cannot intentionally lie if they believe their statements, and Mr. Clark clearly had injuries for which he sought medical attention. If the panel's finding that Mr. Clark believed his statements to be true is correct, then there is no proof that Mr. Clark failed to comply with reasonable standards of conduct and/or violated that public trust.

**Violation of DCSO Policy 1-1.312 Employee Conduct, Number 26: Knowingly making false statements, deliberately omitting facts, or failing to cooperate during an inquiry or investigation, whether formal or informal.**

. . .

11. . . . While the proof shows that Mr. Clark may have over-estimated the extent of his injuries, it doesn't show that he intentionally omitted facts or failed to cooperate with an investigation.

**Violation of DCSO Policy 1-1.312 Employee Conduct, Number 27: Dishonest behavior.**

12. At the disciplinary hearing, Mr. Clark stated that he filed the police report because he believed that he had been assaulted by Officer Peralta. Investigator Franklin testified that it was subjective as to who the aggressor was but it was clear that Officer Peralta had Mr. Clark in two different headlocks, that Officer Peralta had to let go to stop the fight, and that Officer Peralta had not let Mr. Clark go after at least two verbal commands from Instructor Johnson. Nevertheless, the disciplinary panel found that Mr. Clark had intentionally filed a false police report, even though Mr. Clark genuinely believed that he had been attacked. This conclusion is logically inconsistent.

**Violation of DCSO Policy 1-1.312 Employee Conduct, Number 32: Degrading, harassing, or cursing any person.**

13. . . . Neither Ms. Easley nor Ms. Smith testified that Mr. Clark had cursed specifically at them, or used foul language when referring directly to them, and both testified that Mr. Clark seemed more angry at the process and the amount of time between treatment, rather than with them personally. In fact, at the time of the Appeal Hearing, Mr. Clark still had

- 16 -

not received the relevant treatment requested by the doctors during his IOD process with the third part medical providers some six (6) months later.

The ALJ concluded that, "The only policy or rule violation established conclusively by the proof" was for "degrading, harassing, or cursing any person." The proof showed that Mr. Clark had used "a degrading term when referring to a doctor." Moreover, the ALJ noted that Mr. Clark's conduct toward Ms. Easley and Ms. Smith was "unprofessional," but "not outrageous given his level of frustration in trying to obtain medical care for an injury he believed he had." The ALJ determined that Mr. Clark should receive a ten-day suspension for his unprofessional conduct toward Ms. Easley and Ms. Smith. He described Mr. Clark as "an exemplary police officer." Mr. Clark had no major disciplinary infractions in seven years of service, and the ALJ did not consider termination an appropriate punishment under the circumstances. Finally, the ALJ stated, the disciplinary panel's findings and punishments were not supported by the evidence. Rather, "[r]elevant testimony established that Mr. Clark's employment was terminated because he filed a police report and an IOD report, making his termination retaliatory and in clear violation of public policy and the whistleblower statutes." The ALJ reversed Mr. Clark's termination and reinstated him to his former position with full back pay and benefits minus a ten-day suspension.

Metro filed a petition for reconsideration of the ALJ's initial order. On January 14, 2014, the Civil Service Commission voted to strike language in the ALJ's initial order pertaining to retaliation and the whistleblower statutes; otherwise, the ALJ's initial order was adoption by the Commission as the final order.

Petition for review in chancery court

Metro filed a petition for review of the Commission's final order in chancery court on February 11, 2014. The chancery court found that the ALJ's decision was not supported "by substantial and material evidence in light of the entire record." We will discuss the reasoning of the chancery court in our analysis below. The court reversed the orders of the Commission and remanded the case for a determination of the appropriate disciplinary sanction.

Mr. Clark filed a motion to alter or amend, which was denied by the chancery court on July 7, 2014. This appeal followed.

ISSUES ON APPEAL

Mr. Clark raises the following issues on appeal: (1) Whether the chancery court erred in reversing the decisions of the ALJ and the Commission, and whether Mr. Clark was denied effective assistance of counsel and due process when the chancery court "was not allowed to consider facts not presented for review;" and (2) whether Mr. Clark's

"rights and due process have been violated and if any violations have risen against public policy and the peace and dignity of the State of Tennessee." Metro asserts that the chancery court erred in remanding the case to the Commission for a determination of the appropriate punishment rather than reinstating the DCSO's decision to terminate Mr. Clark.[2]

## STANDARD OF REVIEW

Judicial review of the final decision of an administrative agency is governed by the Tennessee Uniform Administrative Procedures Act ("UAPA"), Tenn. Code Ann. § 4-5-101 *et seq. See Story v. Civil Serv. Comm'n*, No. M2010-01214-COA-R3-CV, 2011 WL 2623904, at *2-3 (Tenn. Ct. App. July 5, 2011). The UAPA limits our scope of review as follows:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h).

Under the UAPA, this court, like the trial court, must apply the substantial and material evidence standard to the agency's factual findings. *City of Memphis v. Civil Serv. Comm'n*, 239 S.W.3d 202, 207 (Tenn. Ct. App. 2007). Substantial and material

---

[2] After filing his notice of appeal, Mr. Clark filed two motions in this Court to vacate the chancery court's judgment for lack of subject matter jurisdiction on the ground that Metro's petition for review was not timely filed. We denied the first motion and we hereby deny the second motion. Pursuant to Tenn. Code Ann. § 4-5-317(e), "[t]he sixty-day period for a party to file a petition for review of a final order shall be tolled by granting the petition [for reconsideration] . . . and a new sixty-day period shall start to run upon disposition of the petition for reconsideration by issuance of a final order by the agency." The final order of the Commission was entered on January 21, 2014, and Metro's petition for review was timely filed on February 11, 2014.

evidence is "'such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.'" *Macon v. Shelby Cnty. Gov't Civil Serv. Merit Bd.,* 309 S.W.3d 504, 508 (Tenn. Ct. App. 2009) (quoting *Pruitt v. City of Memphis,* No. W2004-01771-COA-R3-CV, 2005 WL 2043542, at *7 (Tenn. Ct. App. Aug. 24, 2005)). It is "'something less than a preponderance of the evidence, but more than a scintilla or glimmer.'" *Id.* (quoting *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.,* 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988)).

ANALYSIS

Before addressing Mr. Clark's arguments, we note that Mr. Clark's brief fails to comply with Tenn. R. App. P. 27(a) in that he fails to cite to the record. Included with Mr. Clark's brief is a disc containing exhibits, and his brief frequently cites to these exhibits, some of which do not appear in the court record. Because of Mr. Clark's failure to cite to the record, it is difficult for this court to discern whether some of his factual statements are supported by the record. In analyzing Mr. Clark's arguments, we will consider only the evidence in the record. *See* Tenn. Code Ann. § 4-5-322(h)(5).

1.  Substantial and material evidence

We begin by considering whether the trial court correctly determined that the ALJ's decision was not supported by substantial and material evidence.

On the issue of substantial and material evidence, Mr. Clark asserts that he had a duty to report the actions of Mr. Peralta and to file a police report and that he should not have suffered any retaliatory action as a result. He argues that Investigator Franklin's "relationship with the alleged attacker and several witnesses should have disqualified himself." Mr. Clark emphasizes his high marks on evaluations and absence of prior disciplinary infractions. Mr. Clark further argues that Mr. Peralta admitted the use of lethal force and that Ms. Stone admitted retaliation by the disciplinary board before the ALJ. He further alleges that the doctors he saw other than the doctors to whom he was referred by the IOD program supported the ALJ's decision.

The chancery court, in its decision, explained its reasoning for finding no substantial and material evidence to support the ALJ's decision:

> 1. Mr. Clark did not testify. Accordingly, his unofficial and official statements quoted as follows constitute the evidence of Mr. Clark's version of the Altercation and his injuries.
>
> In an October 6, 2012 Sensitive Access Incident Report (SAIR), Mr. Clark made these claims about the Altercation (Record at 274):

On October 4, 2012 at JNC, I Cpl Jerry Clark was in subject control training. We were conducting exercises with fist and elbow strikes and cross body control of subject. First my partner (Cpl Peralta) performed exercises on me then I Cpl Clark repeated the same exercise on him. Suddenly Cpl Peralta without warning violently attacked me (Cpl Clark). I Cpl Clark was slammed to the floor or wall (Not sure which) and knocked unconscious with a closed head injury (Concussion). While defenseless and unconscious, Cpl Peralta continued striking me (Marks on both sides of body and deep soreness in back and rib areas, pictures were taken[3]) and implemented an upper vascular restraint hold (Scissor lock) squeezing off blood supply to the brain. I, Cpl Clark (started to gain awareness) heard trainer Johnson order stop and to disengage. I Cpl Clark felt Cpl Peralta begin to squeeze harder (place higher pressure on my vascular neck areas) refusing to disengage. Again Trainer Johnson ordered stop and to disengage. I Cpl Clark began to feel pain in the neck and serious concern (panic) for injury. I Cpl Clark attempted to escape the attack by kicking towards the upper body but was rendered unconscious (Blacked out). I do not remember being separated or getting off the floor. Clearly Cpl Peralta's intent was to inflict serious harm. While unconscious Cpl Peralta took hold of my neck again and continued choking me placing my neck in an underarm choke and lifting my body up from the floor. I was still unconscious and completely defenseless. I was told Trainer Johnson gave several commands to stop[.] I only remembered 2. When I recovered awareness, I remember Cpl Peralta was leaving the gym and I was reassigned to another partner. Later (1-2 hours) my neck and shoulders areas began to hurt and motion was restricted. I believe this assault was retaliation for something but do not know why. I informed Trainer Johnson about the injury and will make a report the next day. I know this attack was not provoked and Cpl Peralta willfully and intentionally assaulted me. Cpl Peralta selected me as a partner, unknown to me what his intentions were. I was taken to MTMC and was diagnosed with a concussion and neck injuries. The next day I had increased pain shooting down my neck, arms and body regions. I felt numbness in the right

---

[3] There are no pictures in the record.

arm, severe headaches and dizziness. Two strike marks appeared on both sides (Pictures taken) near lower rib areas with pain and tenderness in surrounding areas. MNPD was notified and complaint given. Third day pains appear in middle, lower back and kidney [regions]. The headaches increased with dizziness. I will be going to hospital for additional evaluation. Updates will be added as discovery continues. EORJC.

On a Fantasy Football Message Board Mr. Clark made these claims (Record at 277-78):

I was attacked and slammed knock [sic] unconscious then placed in scizzor [sic] lock choke out a second time then while out placed in another choke and dragged by the neck, without cause or reason. Now I have concussion & neck injury and these MF think it's a joke.
He may have a job now by I am seriously seeking charges.
Funny right!!!!!!!7

To a doctor, Mr. Clark claimed (Record at 303), "He was slammed to the mat and choked by a coworker who 'snapped' during a drill with the police department."

The foregoing quoted statements are the bases from which this Court must decide if the proof of record shows Mr. Clark was or was not guilty of dishonesty and the other misconduct he was found by the DCSO to have committed.

2. Contrary to Mr. Clark's version of the Altercation that he was severely attached by Officer Peralta and that Mr. Clark lost consciousness is the testimony of nine witnesses at the contested case hearing: Instructor Johnson, Officer Peralta, Sergeant Solomon Holley, Officer Vincent Feggins, Corporal David Tracy, Sergeant Kyle McMaster, Security Officer Jason Hart, Phillip Dover and General Sessions Court Security Officer Franklin Taylor. They all testified Mr. Clark did not lose consciousness, did not appear disoriented, did not lose control of his body and fall to the ground, did not lie on the floor with his eyes closed, did not cry out to be released, and did not have trouble participating the rest of the day.

3. Next, Brandi Easley, a claims adjuster, testified that Mr. Clark in his version of the Altercation and, his condition, and his dealings with Ms. Easley, was explosive; exclamatory; very, very upset; accusatory with her;

called the assigned doctor a "quack"; and that Mr. Clark was going off the deep end.

4. Further, Laura Smith, a case manager, testified that Mr. Clark used profanity with her and hung up on her.

5. Additionally, Attorney Stone, who chaired the DCSO Disciplinary Panel, testified that in the disciplinary hearing, Mr. Clark was at first calm, but then became more and more agitated, and his stories about being unconscious changed.

6. Because Mr. Clark did not testify [before the ALJ], the evidence described above was unrefuted. Moreover, this Court's study of the cross examinations by Mr. Clark's counsel did not produce any substantial and material impeachment of the above witnesses' testimony as is confirmed by the absence in the September 19, 2014 Brief of Respondent of such impeachment points.

7. As to the evidence the ALJ relied upon, there are medical records from physicians Mr. Clark consulted after the Altercation which the ALJ found to prove and justify Mr. Clark's characterization of the events. The Record does not support that finding. The ALJ found that the DCSO's charges that Mr. Clark lied were not supported by the evidence because Mr. Clark "correctly reported his injuries as they were diagnosed by the physician who saw him less than 24 hours after the incident." The ALJ is referring to medical records at pages 298-305 of the Record which report that Mr. Clark had a concussion and brief loss of consciousness. The medical records further show, however, that at the time of the medical examinations Mr. Clark was normal, and that it was his history and version of the severity of the Altercation and his subjective perception of his injury he reported to the physician that supplied the symptom of a loss of consciousness. The medical records, therefore, do not refute the DCSO's charges.

8. Also significant to the ALJ was that the DCSO found that "Mr. Clark had deliberately lied about the facts of the incident, even though they [DCSO disciplinary panel] also found that he [Mr. Clark] believed the facts that he had presented." This is an incorrect characterization. As quoted below, the DCSO found Mr. Clark appeared to believe his subjective version of the events; however that subjective version deviated materially and substantially from the real events which occurred. Moreover, Mr. Clark was found to have omitted numerous important facts in his version, making it false. Page 142 of the Record is the December 26, 2012

- 22 -

termination letter documenting the DCSO disciplinary findings which states as follows:

> When determining proper discipline for this incident, the panel members felt that you perceive your version of events to be an accurate representation of facts. However, the panel found that you omitted facts and that you were not rendered unconscious. This is based on their review of all witness statements, including yours. Witness statements by the instructor and other participants in the exercise insist you were the aggressor in the incident; you [were] never rendered unconscious; you participated actively; you responded to verbal instructions without delay after the event; you asked appropriate questions of your instructor as your training continued; you were capable of unusually-high performance while at the firing range; you made no mention of being rendered unconscious at any point during the training or while at the range; your instructor said you were "clear eyed;" only after viewing comments on a personal website do you mention being rendered unconscious; you then display an apparent desire to affect another employee's position with the agency. During the investigation, you state that another officer present informed you that you [had] been rendered unconscious. When asked about this claim during the investigation, the officer denied having told you so. You were found to have been unduly antagonistic toward the case manager assigned. As a result, the panel finds by a preponderance of the evidence that your version of events is not accurate.
>
> After weighing these issues, the panel elected to terminate your employment effective December 26, 2012.

Accordingly, the ALJ's reliance on the DCSO Disciplinary Panel finding that Mr. Clark believed the facts he had presented is misplaced.

Based upon this analysis, the chancery court concluded that the ALJ's finding that Mr. Clark "did not commit the misconduct" at issue was not supported by substantial and material evidence and, therefore, reversed the ALJ's decision.

We find the chancery court's analysis to be correct. As the chancery court emphasized, Mr. Clark did not testify before the ALJ. All of the witnesses who did testify firmly contradicted Mr. Clark's story that he was attacked and rendered

unconscious during the training. Because Mr. Clark did not testify, the testimony of Metro's witnesses was unrefuted. The medical opinions relied upon by the ALJ were based upon Mr. Clark's statements about what had happened to him, not upon any objective testing or significant findings by the physicians upon examining Mr. Clark. The neurologists who examined Mr. Clark and performed tests found no evidence of a concussion or other neurological deficits. The disciplinary panel found that Mr. Clark had omitted important facts and that his version of the events was not accurate. Thus, as the chancery court concluded, "the ALJ's reliance on the DCSO Disciplinary Panel finding that Mr. Clark believed the facts he had presented is misplaced." Substantial and material evidence does not support the decision of the ALJ, which is based upon giving credence to Mr. Clark's version of events.

The argument section of Mr. Clark's brief is quite short. Other than his argument regarding substantial and material evidence, summarized above, he states that he "was never permitted opportunity to question accusers, see any records to prepare, or given reasonable time to prepare a defense." We do not consider one sentence sufficient to constitute an argument regarding due process or effective assistance of counsel. *See Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) (holding that the failure to cite to any legal authority or to fashion an argument constitutes waiver of an issue). There is nothing in Mr. Clark's argument section regarding violations of public policy or the peace and dignity of the State, as set forth in the issues section of his brief. We therefore consider this issue waived.

## 2. Remand for determination of punishment

After reversing the decision of the ALJ, the chancery court remanded the case to the Commission for a determination of the appropriate disciplinary sanction. Metro argues that this was error and that the chancery court should have reinstated the DCSO's decision to terminate Mr. Clark.

The chancery court addressed its reasons for remanding the case for a determination of the appropriate punishment in its order denying the motion to alter or amend. The court relied upon sections 12.03[4] and 12.05 of the Code of the Metropolitan Government of Nashville and Davidson County ("Metro Code"). Section 12.05 of the Metro Code provides, in pertinent part:

---

[4] Section 12.03 of the Metro Code provides, in pertinent part, that it shall be the duty of the Commission to, "Upon the request of an affected employee, review suspensions, demotions or separation from service of any employee in classified service, and to render decisions thereon, subject to its rules." Metro Code § 12.03(e).

Any employee terminated from the classified service or suspended or demoted in pay grade, by his simple written request to the commission, shall have the action reviewed by the commission. If the commission does not approve the action, it may modify or reverse it, and provide whatever recompense is indicated, which shall not exceed net loss of earnings. In a review by the commission of any disciplinary action, the disciplinary authority shall bear the burden of proof of just cause for discipline.

The chancery court reasoned that, in the administrative appeal, the ALJ conducted an "evidentiary hearing to obtain proof and provide a record on whether Mr. Clark had committed the misconduct in issue." The chancery court then reviewed that part of the case and determined that the misconduct had been established. On remand, the "narrow issue . . . [is] whether the disciplinary action of termination or other punishment is appropriate." Pursuant to sections 12.03 and 12.05 of the Metro Code, the chancery court stated, "the issue should be decided by the Commission."

The case relied upon by Metro, *City of Memphis v. Civil Service Commission of City of Memphis*, 216 S.W.3d 311, 314-15 (Tenn. 2007), involved the issue of whether the police department had acted properly in terminating a police officer for certain violations. There was no dispute about the officer's actions; the dispute was over the appropriate discipline. *City of Memphis*, 216 S.W.3d at 316-17. The police department terminated the officer, but the Commission decided that termination was not reasonable and ordered the officer reinstated. *Id.* at 312. The chancery court affirmed the Commission. The Court of Appeals reversed and held that the officer was lawfully terminated; the Supreme Court affirmed the decision of the Court of Appeals. *Id.* In the present case, unlike in *City of Memphis*, the issue addressed by the chancery court was whether or not Mr. Clark had engaged in the actions for which he had been disciplined by the DCSO. The chancery court reasoned that, once it had determined that the misconduct had actually occurred, the most appropriate action was to remand to the Commission to allow it to perform its duty of reviewing the disciplinary determination in accordance with §§ 12.03 and 12.05 of the Metro Code.

We find no error in the action of the chancery court in remanding the case to the Commission for a determination of the appropriate discipline in light of the court's decision concerning Mr. Clark's commission of the underlying misconduct.

CONCLUSION

For the foregoing reasons, the judgment of the chancery court is affirmed in all respects. This matter is remanded with costs of appeal assessed against the appellant, Jerry Clark.

_____
ANDY D. BENNETT, JUDGE